STATE of Minnesota, By Warren
SPANNAUS, its Attorney
General, Respondent,

v.

Dexter R. HOPF, et al., Respondents
Below,

Naegele, Inc., Appellant,

Park Properties, Respondent.

STATE of Minnesota, by Warren
SPANNAUS, its Attorney
General, Respondent,

v.

Grant A. WARD, et al., Respondents
Below,

Naegele, Inc., Appellant,

Joseph L. Winkler, et al., Respondents
Below.

Nos. 81–456, 81–498, 81–519 and 81–544.

Supreme Court of Minnesota.

Aug. 27, 1982.

Faegre & Benson and Gordon Conn, Jr., Minneapolis, for Naegele, Inc.

Ince Tischleder & Associates and Marvin Liszt, Bloomington, Peterson, Engberg & Peterson and Richard Pepin, Jr., and Bradley Gillan, Minneapolis, for Naegele, Inc. and Naegele Outdoor Advertising Co. of the Twin Cities, Inc.

Warren Spannaus, Atty. Gen., James C. Donnelly and John C. Jeppesen, Sp. Asst. Attys. Gen., St. Paul, for State By Spannaus.

Donald L. Bush, Minneapolis, for Park Properties.

WAHL, Justice.

The state seeks condemnation under the Minnesota Outdoor Advertising Control Act, Minn.Stat. §§ 173.01–173.27 (1980) (the Act), of certain advertising devices (signs) owned by Naegele, Inc.[1] The district courts of Hennepin and Ramsey Counties, where the actions were brought, granted the state's petitions as to all signs in question. We have consolidated the appeals from these decisions which we now affirm in part and reverse in part.

The state filed two petitions in Hennepin County on May 30, 1979: *State v. Hopf* and *State v. Duggan.* These were consolidated by the court on August 28, 1979, and are referred to herein as the *Hopf-Duggan* proceeding. The state initially sought in *Hopf-Duggan* to condemn 20 signs, many of which were subsequently removed from the proceeding. The action now involves only two signs, which are described in the parties' stipulated facts as follows:

5AD1312 which is along State Highway No. 7 on the same side of the highway as Lake Minnetonka Alliance Church in Shorewood. It is 18 feet in a direct line from the sign to the church property and 108 feet in a direct line from the sign to the church building.

5AD0853 which is along State Highway No. 7 across the road from Lake Minnetonka Alliance Church. It is in the village of Greenwood, 175 feet from the church property line and 275 feet from the church building.

Hennepin County District Court granted the state's petition to condemn these signs under the Act on the ground that they are located within 100 feet of a church, in violation of Minn.Stat. § 173.08, subd. 2(2) (1980).

The state also filed two petitions in Ramsey County: *State v. Ward* and *State v. Winkler.* These were consolidated by order of the court on April 25, 1979, and are referred to herein as the *Ward-Winkler* proceedings.[2] In *Ward-Winkler*, the state initially sought to condemn 65 signs, 21 of which are the subject of this appeal. The parties have stipulated to the following descriptions of seven signs that the state claims are within 100 feet of a church or school:

---

1. During the pendency of these proceedings, Naegele, Inc. purchased Naegele Outdoor Advertising Company of the Twin Cities, Inc. We ordered a substitution of Naegele, Inc. as the party appellant on February 9, 1982.

2. Naegele is a party to seven similar actions which are pending in the following counties: Hennepin (*State v. Meshbesher*, petition presented July 10, 1979); Anoka (*State v. Peterson*, petition presented March 7, 1979); Carver (*State v. Finch*, petition presented September 15, 1978); Dakota (*State v. Weber*, petition presented April 12, 1979); Scott (*State v. Boudin*, petition presented October 6, 1978); Sherburne (*State v. Baldwin*, petition presented April 12, 1979); Washington (*State v. Landgraver*, petition presented April 16, 1979). These actions originally involved 338 of Naegele's signs.

9AD2216 which is on the opposite side of Interstate 94 and directly across from First Baptist Church in St. Paul. It is 430 feet in a direct line from the sign to the church property.

9AD2218 which is on the same side of Interstate 94 and 65.5 feet from St. Mary's Catholic Church and School Building.

9AD2217 which is on the same side of Interstate 94 and 73 feet from the property line of First Baptist Church. The device is 223 feet from the church building.

9AD2239 which is on the opposite side of Highway 51 and directly across from Macalaster College. It is 100 feet in a direct line from the college property line to the highway right of way and less than 2 feet further along that same line to the sign.

9AD2241 which is on the opposite side of Highway 51 and directly across from the Jehovah Evangelical Lutheran Church. It is 100 feet in a direct line from the church property to the highway right of way line at the point nearest the sign, and less than 2 feet further along that same line to the sign.

9AD2242 which is on the same side of Highway 51 and 82 feet from the property line of the John Hancock School building.

9AD2078 which is on the opposite side of Highway 280 and directly across from Murray High School. It is 540 feet in a direct line from the sign to the property line of the school.

The remaining 14 signs are located in areas which have been rezoned from commercial to residential.

Naegele raises five issues on appeal: (1) whether Chapter 1, Section 3 of the laws of 1979, Ex.Sess., precludes the granting of the state's petition; (2) whether Minn.Stat. § 173.08, subd. 2(2) (1980) prohibits the lo-cation of advertising devices in adjacent and business areas as well as in scenic areas; (3) whether 14 M.C.A.R. § 1.5037(F)(4) (1980) provides a reasonable method for measuring the distance from the school or church to an advertising device; (4) whether the exemption of on-premises devices from the prohibition of Minn.Stat. § 173.08, subd. 2 (1980) violates the equal-protection clause of the Fourteenth Amendment; and (5) whether the state may condemn advertising devices in areas that have been rezoned from industrial or commercial to residential.

1. Section 3 of the 1979 Transportation Appropriations Act (T.A.A.) provides that:

Upon enactment of this act the commissioner shall spend no money to acquire highway advertising devices pursuant to Minnesota Statutes, Chapter 173, * * * except those for which acquisition proceedings were begun before enactment of this act, and for which federal money has been appropriated by Congress and the federal share has been made available to the commissioner.

Act of June 7, 1979, ch. 1, § 3, 1979 Minn. Laws, Ex.Sess., 1203, 1204. Naegele argues that this section precludes the granting of the *Hopf-Duggan* petitions because (a) the acquisition proceedings were not begun before enactment of the T.A.A., (b) federal money had not been appropriated for the purchase, and (c) the federal share had not been made available to the commissioner.[3]

The T.A.A. was enacted on June 7, 1979, and took effect on July 1, 1979. Minn.Stat. § 645.02 (1980). The *Hopf-Duggan* petitions were filed in Hennepin County on May 30, 1979, served on Naegele on June 8, 1979, and heard by the court on August 28, 1979. It is Naegele's position that the acquisition proceedings began with the presentation[4] of the petitions on August 28,

---

3. This section of the argument pertains only to the *Hopf-Duggan* proceedings. There is no claim that the *Ward-Winkler* proceedings did not begin before the effective date of the 1979 Transportation Appropriations Act.

4. "In all cases [of eminent domain] a petition * * * shall be presented to the district court in which the land is situated * * *." Minn.Stat. § 117.055 (1980). In *State v. Frisby*, 260 Minn. 70, 108 N.W.2d 769 (1961), we found that "[t]he court acquired jurisdiction by the presentation of the petition to the district court * * * and by statutory notice to persons inter-

1979, and that they are barred because they were not initiated before the enactment of the T.A.A. The trial court allowed the cases to proceed, however, because it found that the actions had commenced on the date of filing, not on the date of presentation.

We agree with the court below and hold that a proceeding in eminent domain begins with the filing of the petition. This conclusion is mandated by the language of the lis pendens statute which provides that "[a]t the time of filing the petition the petitioner may file for record with the county recorder a notice of the pendency of the proceeding * * *." Minn.Stat. § 117.065 (1980). Reference to "the pendency of the proceeding" after the petition is filed indicates legislative intent that the eminent-domain proceeding begin with the act of filing.

We noted in *State v. Appleton*, 208 Minn. 436, 440, 294 N.W. 418, 420 (1940) that "[i]t is the filing of the petition in condemnation * * * that authorizes the state at its option to enter upon and take possession of the land sought to be condemned." Since the act of filing authorizes the state to enter upon and take possession of the land, the act of filing begins the eminent domain proceeding.

We find no merit in Naegele's suggestion that the appropriation and availability of federal money for acquisition are requirements which must be met before the court may hear a condemnation petition. In its memorandum accompanying the *Hopf-Duggan* petitions, the district court pointed out the absurdity of regarding these requirements as jurisdictional:

If Negele's contention that this is a jurisdictional issue were accepted, the State would be placed in the preposterous position of being unable to appoint commissioners to determine damages to be awarded until after the commissioners had determined the amount of the damages, thereby showing that the federal monies were adequate.

Even though it was not a jurisdictional requirement, the court did receive evidence of the appropriation and availability of federal money in the form of an affidavit in which the Right of Way Operations Coordinator for the Department of Transportation stated that "there is presently available approximately $1,000,000.00 in Federal funds obligated to this purpose."

2. The Minnesota Outdoor Advertising Control Act (the Act) provides that "[n]o advertising device shall be erected or maintained * * * [w]ithin 100 feet of a church or school." Minn.Stat. § 173.08, subd. 2(2). Naegele has argued that this statute applies only to devices in scenic areas [5] and that, therefore, the Act does not give the state authority to condemn the nine devices in adjacent or business areas which it claims are within 100 feet of a church or school. The trial courts concluded that Minn.Stat. § 173.08, subd. 2, regulates devices in adjacent and business areas [6] as well as those in scenic areas. We agree.

The legislature had previously restricted the application of the church or school prohibition but chose not to do so in the present Act. In its original version, passed

ested * * *." *Id.* at 76, 108 N.W.2d at 773. We reject Naegele's argument that the court's acquisition of jurisdiction is equivalent to commencement of proceedings.

**5.** A scenic area is "an area within which control and regulation of the erection and maintenance of advertising devices may be exercised to the extent * * * provided [by the Act] and such areas include only those established as such by the commissioner of transportation." Minn.Stat. § 173.02, subd. 4 (1980). Scenic areas "may include in part but shall not be limited to areas containing national, state or local parks, historic sites and monuments, and

picnic, rest, or recreation areas maintained by the public." Minn.Stat. § 173.04, subd. 2 (1980).

**6.** The Act defines "adjacent area" as "any area adjacent to the right of way of an interstate or trunk highway," Minn.Stat. § 173.02, subd. 8 (1980), and defines "business area" as "any part of an adjacent area which is (a) zoned for business, industrial or commercial activities * * * or (b) not so zoned but which constitutes an unzoned commercial or industrial area as herein defined." Minn.Stat. § 173.02, subd. 9 (1980).

in 1965, the Act addressed the prohibition in two sections, Minn.Stat. § 173.16(4) (1965), regulating signs along interstate highways, and Minn.Stat. § 173.46(4) (1965), regulating signs along trunk highways. Neither section referred to any specific area of prohibition, but each was limited by another statute which stated that the church or school prohibition did not apply within areas zoned for business and commercial development. Minn.Stat. §§ 173.12 and 173.-42 (1965). In spite of the language it had formerly used, when the legislature revised the Act in 1971 it put no restrictions on the prohibition.[7] Subdivision 2 contains no qualifiers and no exceptions. The absence of any express limitations on the scope of the subdivision expresses clear legislative intent not to restrict the church or school prohibition to any specific areas.

A close reading of section 173.08 further supports our conclusion that subdivision 2 applies to devices in business areas as well as those in other areas. Paragraphs (a)–(g) permit, with only minor restrictions in paragraph (a),[8] such categories as directional signs, public utility signs and signs advertising the sale of property. Paragraph (h) excludes from regulation advertising devices in business areas "which comply * * * with the provisions of Laws 1971, Chapter 883." Since the prohibition of subdivision 2(2) is a part of Chapter 883, subdivision 1(h) excludes from regulation only those devices in business areas which are not otherwise prohibited by subdivision 2.

Naegele argues that sections 173.01–173.-11 regulate advertising devices only in scenic areas, while sections 173.01, 173.02 and 173.13–173.24 regulate devices in adjacent areas.[9] Under this theory, section 173.08 applies only to scenic areas because of its placement within the overall Act. By its own terms, however, subdivision 1 of section 173.08 applies to adjacent areas: "No advertising device * * * shall be erected or maintained in an adjacent area * * *." Since subdivision 1 expressly applies to adjacent areas, we find no significance in the placement of the statute within the overall Act. We hold that subdivision 2 bans advertising devices within 100 feet of churches or schools in adjacent or business areas as well as in scenic areas.

3. Since we have concluded that Minn. Stat. § 173.08, subd. 2(2) applies to adjacent and business as well as to scenic areas, we must decide whether 14 M.C.A.R. § 1.5037(F)(4) (referred to herein as 37(F)(4)) provides a reasonable method for measuring the distance from the church or school to an advertising device. Regulation 37(F)(4) provides:

For the purposes of Minn.Stat. § 173.-08, subd. 2, the restrictive distances that determine areas in which advertising devices are prohibited will apply to lands along and adjacent to Interstate, primary highways and expressways and fully controlled freeways both before and beyond property used for any school, (or) church * * *. Such restrictive distances shall be measured along the edge of the roadbed beginning at a point which is an extension, perpendicular to the edge of the roadbed, of the intersection of the property line of the area and the normal highway right-of-way line. The restrictive distances shall apply to lands along and adjacent to the opposite side of the interstate, primary highway, expressway and controlled freeway, as measured by an imaginary line crossing the highway.

Naegele has objected to both provisions of the regulation: the first provision which requires that distances be measured from the property line of churches and schools, rather than from the buildings themselves,

---

7. The legislature's 1971 revision was prompted by federal statutes regulating advertising devices. 23 U.S.C. § 131 (1980).

8. Subdivision 1(a) excludes directional signs "which comply with regulations which shall be promulgated by the commissioner relative to their lighting, size, spacing and other requirements as may be appropriate to implement

Laws 1971, Chapter 883." Minn.Stat. § 173.-08, subd. 1(a) (1980).

9. Minn.Stat. § 173.12 (1980) specifically provides that "Sections 173.01 and 173.02 and sections 173.13 to 173.24 shall apply to adjacent areas on interstate or primary highways."

and the second provision which requires that, when the sign is on the opposite side of the road from a church or school, the road shall be treated as dimensionless.

█ The legislature has granted the commissioner of transportation authority "to promulgate rules and regulations governing the erection and maintenance of outdoor advertising devices as may be necessary to carry out the policy of the state declared in this chapter." Minn.Stat. § 173.185, subd. 2 (1980). Regulation 37(F)(4) is a legislative rule promulgated pursuant to statutory authority. As such it "is valid and is as binding upon a court as a statute if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable." 1 K. Davis, Administrative Law Treatise § 50.03, at 299 (1958). Since Naegele has raised no procedural objections, the question is whether 37(F)(4) is within the granted power and is reasonable.

The stated purposes of the Act are to "promote the general welfare of the people and * * * conserve the natural beauty of areas adjacent to certain highways." Minn. Stat. § 173.01 (1980). Since the Act regulates advertising along major highways, its focus is to preserve the beauty of the highways for those who use them. The specific purpose of the 100-foot ban is to preserve the beauty of church and school sites for those traveling along the highways of our state.

█ A commission has "an implied power to formulate necessary classifications and definitions within the designated area of regulation." *Welsand v. State of Minnesota Railroad & Warehouse Commission*, 251 Minn. 504, 509, 88 N.W.2d 834, 838 (1958) (footnote ommitted). In determining that the 100-foot distance will be measured from the property line, the commissioner has formulated a classification that will carry out the purposes of the Act. We conclude that this provision is within the granted power.

█ We further find it reasonable for distances to be measured from the property line rather than from the church or school building. In cases involving measurement

of distances from a particular establishment to liquor premises, "[m]ost of the courts have taken the view that the grounds are a part of the institution or establishment and that therefore measurement must be from the edge of the grounds." 4 A.L.R.3d 1250, 1263 (1965). *See Smith v. Ballas*, 335 Ill. App. 418, 82 N.E.2d 181 (1948). So here, for purposes of the Minnesota Outdoor Advertising Control Act, church and school grounds are part of the institution. We hold that Regulation 37(F)(4) is a valid interpretation of section 173.08, subd. 2(2) insofar as it requires the measurement of distances from the property line and not from the church or school building.

█ That provision of 37(F)(4) which treats the highway as dimensionless when measuring the 100-foot distance, however, directly contravenes the statute and thus is not within the power granted to the commissioner. It acts to ban devices that are more than 100 feet from church or school property. Device 9AD2216 is a case in point. Even though it is 430 feet from church property, this sign is banned by Regulation 37(F)(4) because Interstate Highway 94 lies between the sign and the church.

An exact reading of Minn.Stat. § 173.08, subd. 2(2) compels the conclusion that the legislature intended to ban advertising devices within 100 feet of churches and schools. We hold that 14 M.C.A.R. § 1.5037(F)(4) is invalid insofar as it requires that the width of a highway not be included in measuring the 100-foot distance beyond church and school property and reverse the trial courts' decisions to the contrary. Devices 5AD0853, 9AD2216, 9AD2239, 9AD2241 and 9AD2078 are not prohibited since they are not within 100 feet of a church or school. Devices 5AD1312, 9AD2218, 9AD2217 and 9AD2242 are prohibited under the statute unless Naegele prevails on the constitutional issue.

4. Naegele argues that the state's failure to condemn on-premise devices located within 100 feet of a church or school deprives it of the equal protection of the laws under the Fourteenth Amendment to the

United States Constitution. The regulation defines an on-premise sign as "[a]n advertising device located on the premises (or contiguous property) of an individual, business or organization when the sale or lease of the premises or the identification, products or services of the individual, business or organization are the subject of the advertising device." 14 M.C.A.R. § 1.5037(C)(1) (1980). The Act excludes on-premise signs from regulation.[10] Naegele argues that, by exempting on-premise signs from the ban of Minn.Stat. § 173.08, subd. 2(2), the state has created a classification that is impermissible under the Fourteenth Amendment.

■ We will uphold a legislative classification that is rationally related to a legitimate government objective. *Davis v. Davis*, 297 Minn. 187, 189–90, 210 N.W.2d 221, 224 (1973).[11] To determine the legitimacy of the state's objectives, we must analyze Naegele's claim under the First Amendment.

Naegele argues that the on-premise/off-premise distinction is an impermissible regulation of content because the determination of whether a particular sign is allowed at a given location is a function of the message on the sign itself. The United States Supreme Court has held that time, place and manner restrictions on speech are permissible if "they are justified without

reference to the content of the regulated speech, * * * serve a significant governmental interest, and * * * leave open ample alternative channels for communication and information." *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976).

Is the on-premise/off-premise categorization a distinction based on content? A content-based distinction is one such as that struck down in *Consolidated Edison Co. of New York v. Public Service Commission of New York*, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), where the Court ruled that the Public Service Commission of New York could not prohibit public utilities from including in their monthly bills inserts discussing controversial issues of public policy, namely the benefits of nuclear power. Since the Commission allowed inserts on some subjects but prohibited those in question, its action could not be "upheld as a content-neutral time, place, or manner regulation." *Id.* 447 U.S. at 537, 100 S.Ct. at 2333.

The distinction made by the Minnesota statute is between signs that refer to an activity on the premises and those that do not.[12] The unique nature of the on-premise business sign was recognized by Justice William Brennan when he wrote for the New Jersey Supreme Court:

> While freedom of speech has been described as a "fundamental right," *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 638, 63 S.Ct. 1178, 1185, 87 L.Ed. 1628 (1943), it is not absolute. *Breard v. Alexandria*, 341 U.S. 622, 642, 71 S.Ct. 921, 932, 95 L.Ed. 1233 (1951). We, therefore, do not apply strict scrutiny to the classification.

**10.** No advertising device * * * shall be erected or maintained in an adjacent area * * * except the following:

> \* \* \* \* \* \*
>
> (b) Advertising devices advertising the sale or lease of property upon which they are located * * *;
> (c) Advertising devices advertising activities conducted on the property on which they are located, including * * * goods, sold, stored, manufactured, processed or mined thereon, services rendered thereon, and entertainment provided thereon;
> (d) Advertising devices stating the name and address of the owner * * * or information otherwise required or authorized by law to be posted or displayed thereon.

Minn.Stat. § 173.08, subd. 1 (1980).

**11.** The parties agree that the test to be applied to this classification is whether it bears a rational relationship to the objectives of the Act.

**12.** There is a second exemption for signs advertising the sale or lease of property. Minn.Stat. § 173.08, subd. 1(b) (1980). The Supreme Court has recognized the importance of "for sale" signs and has held that a township may not ban their use in order to achieve a socially desirable objective. *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (township passed ordinance banning "for sale" signs in the hopes of stemming the flight of white homeowners).

The business sign is in actuality a part of the business itself, just as the structure housing the business is a part of it, and the authority to conduct the business in a district carries with it the right to maintain a business sign on the premises subject to reasonable regulations * * *.

*United Advertising Corp. v. Borough of Raritan,* 11 N.J. 144, 146, 93 A.2d 362, 365 (1952). The content of a business sign will vary with the nature of the business. This point was stressed by Justice Brennan in his concurrence to the United States Supreme Court's recent decision striking down an advertising ordinance for the City of San Diego:

[T]he content of the [on-premise] sign depends strictly on the identity of the owner or occupant of the premises. If the occupant is a commercial enterprise, the substance of a permissible sign would be commercial. If the occupant is an enterprise usually associated with non-commercial speech, the substance of the identifying sign would be noncommercial.

*Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 2907, 69 L.Ed.2d 800 (1981) (Brennan, J., concurring). The state, in allowing on-premise signs advertising the business conducted on the property, is not favoring one message over another, as was the State of New York in *Consolidated Edison*; rather it is recognizing the unique nature of the business sign and allowing it an exemption from the 100-foot ban.

Does the regulation serve a significant government interest? We believe it does. The state must decide, as did the City of San Diego,

to value one kind of commercial speech—on-site advertising—more than another kind of commercial speech—off-site advertising. * * * * [T]he city could reasonably conclude that a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there than

it has in using or leasing its available space for the purpose of advertising commercial enterprises located elsewhere.

*Metromedia,* 101 S.Ct. at 2894–95 (citations omitted).[13]

As to the third test under *Virginia Pharmacy Board,* we find that the legislature has left open ample alternative channels for communication of information. The billboard is a unique advertising device which cannot easily be replaced by newspapers, television, leaflets and the like. *Metromedia,* 101 S.Ct. at 2901. However, the Minnesota statute does not require those who would use billboards to find a different method of communication. Since the Act otherwise allows off-premise devices in business areas, we find that their exclusion from a 100-foot area surrounding churches and schools is not an impermissible time, place and manner restriction.

Other courts have upheld the on-premise/off-premise distinction as a legitimate time, place and manner restriction on speech. *Newman Signs, Inc. v. Hjelle,* 268 N.W.2d 741 (N.D.1978), *appeal dismissed,* 440 U.S. 901, 99 S.Ct. 1205, 59 L.Ed.2d 449 (1979); *Suffolk Outdoor Advertising Co. v. Hulse,* 43 N.Y.2d 483, 373 N.E.2d 263, 402 N.Y.S.2d 368 (1977), *appeal dismissed,* 439 U.S. 808, 99 S.Ct. 66, 58 L.Ed.2d 101 (1978); *United Advertising Corp. v. Borough of Raritan,* 11 N.J. 144, 93 A.2d 362 (1952). Insofar as the on-premise/off-premise distinction is a regulation of commercial speech, it has met with approval from the United States Supreme Court, which, in discussing the San Diego ordinance, noted:

In the first place, whether on-site advertising is permitted or not, the prohibition of off-site advertising is directly related to the stated objectives of traffic safety and esthetics. * * * * Second, the city may believe that off-site advertising with is [sic] periodically changing content, presents a more acute problem than does on-site advertising. [Citation omitted.] Third, San Diego has obviously chosen to value one kind of commercial

**13.** The plurality assumes that all on-premise advertising is "commercial" in nature. For a more complete discussion of the commercial-noncommercial distinction, *see infra.*

speech—on-site advertising—more than another kind of commercial speech—off-site advertising. * * * * We do not reject that judgment.

*Metromedia*, 101 S.Ct. at 2894. However, the Supreme Court struck down the San Diego ordinance because of its effect on noncommercial speech. We must, therefore, specifically evaluate the impact of our statute on noncommercial speech in light of *Metromedia*.

The San Diego ordinance allowed on-premise advertising while prohibiting all but 12 very narrow categories of off-premise devices.[14] The effect of the ordinance was to allow signs advertising goods or services available on the premises, to bar signs advertising goods or services offered elsewhere and to prohibit all noncommercial advertising that did not fall into one of the exceptions. *Id.* 101 S.Ct. at 2890. The Court found the ordinance to be an impermissible burden on noncommercial speech: "Insofar as the city tolerates billboards at all, it cannot choose to limit their content to commercial messages; the city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages." *Id.* at 2895. The Court noted that it was not reaching any decision as to the constitutionality of the federal Highway Beautification Act, which, like the Minnesota Act, "does not contain a total prohibition of [noncommercial] billboards in areas adjacent to the Interstate and primary highway systems." *Id.* at 2896, n. 20.

In *Metromedia*, the Court approved the First Circuit's decision in *John Donnelly & Sons v. Campbell*, 639 F.2d 6 (1st Cir. 1980), noting that other courts "have failed to give adequate weight to the distinction between commercial and noncommercial speech." *Metromedia*, 101 S.Ct. at 2895, n.

18. *Donnelly* ruled that sections of the Maine Traveler Information Services Act violated the First Amendment because they, too, impermissibly burdened noncommercial speech. The thrust of the Maine statute was to prohibit all signs except those specifically described in the statute. Exceptions included bus stops, memorial tablets and historical plaques; the legislature also allowed for a 3-week period signs announcing auctions and fairs and political campaign signs. *Donnelly*, 639 F.2d at 9. The court found that the exceptions did not go far enough, primarily because no exception was available "for signs on important public issues * * *. Messages such as 'Abortion is Murder,' 'Save the Whales,' 'No Nukes,' and 'Contribute to your Community Fund' [were] altogether banned." *Id.* at 15.

The Minnesota Act, which limits both commercial and noncommercial devices to certain areas, does not suffer the infirmities of either the San Diego ordinance or the Maine statute. Although section 173.08 bans off-premise devices within 100 feet of a church or school and may, in that way, have a greater impact on noncommercial than on commercial speech, the Act places no restrictions on off-premise signs in business areas. We, therefore, find that the on-premise exclusion is permissible under the First and Fourteenth Amendments.[15]

5. We turn now to the remaining 14 devices, those which the state seeks to condemn because they are located in areas that have been rezoned from commercial or industrial to residential. Under the regulations, "if a business area is rezoned * * *, such business area shall cease to exist and any then legal advertising device existing therein at such time shall become a legal non-conforming device." 14 M.C.A.R. § 1.5037(E)(12) (1980) (hereinafter referred to as 37(E)(12)).

---

14. Permissible off-premise devices included, among others, commemorative plaques, religious symbols, public service signs, and signs on vehicles. *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 101 S.Ct. 2882, 2886, n. 3, 69 L.Ed.2d 800 (1981).

15. We have noted the state's interest in the 100-foot ban and in the exemption for on-premise devices. This is sufficient to form a rational basis for the classification under the Fourteenth Amendment.

An advertising device is a use of land. *Naegele Outdoor Advertising Co. v. Village of Minnetonka*, 281 Minn. 492, 498, 162 N.W.2d 206, 212 (1968). A nonconforming use of land is one "which lawfully existed prior to the enactment of a zoning ordinance, and which is maintained after the effective date of the ordinance although it does not comply with the use restrictions applicable to the area in which it is situated." R. Anderson, 1 American Law of Zoning, § 6.01 at 354 (1976). We have recognized that such "nonconforming uses must either be permitted to remain or be eliminated by use of eminent domain." *County of Freeborn v. Claussen*, 295 Minn. 96, 99, 203 N.W.2d 323, 325 (1972). Under *County of Freeborn*, therefore, the state may acquire these nonconforming devices through its powers of eminent domain.

Naegele has argued that 37(E)(12) is invalid because it is inconsistent with the purposes of the Act, with the local control provisions of Minn.Stat. § 173.16, subd. 5(1), (1980) and with an agreement between the state and the United States Department of Transportation (the "state-federal agreement").[16] We disagree.

We see no merit in Naegele's argument that 37(E)(12) contravenes the purposes of the Act by singling out advertising devices for acquisition while allowing other nonconforming uses to remain in an area newly zoned as residential. The legislature decided to regulate outdoor advertising devices and, in adopting the Act, singled out for acquisition certain devices in areas not zoned commercial. Other commercial uses which are permitted to remain are not within the purview of the Act.

The Act does provide local zoning units with some authority to regulate devices within areas zoned commercial and industrial. Minn.Stat. § 173.16, subd. 5. Naegele's argument that 37(E)(12) is inconsistent with the local control provisions fails to take into account the fact that the 14 devices under consideration are not located in a commercial or industrial area. The local zoning authority has rezoned the area as residential; therefore, the local control provisions of the Act do not apply.

The state-federal agreement provides, in pertinent part, that "[s]igns lawfully in existence in business areas prior to June 7, 1971 will be considered to be conforming to the Federal standards and criteria." Naegele argues that, since the 14 signs under consideration were lawful on June 7, 1971, they cannot now be reclassified. However, this argument ignores another significant provision of the agreement: "Nothing contained [in the agreement] shall be construed to abrogate or prohibit the State or a local jurisdiction from exercising a greater degree of control of outdoor advertising than that required or contemplated by [23 U.S.C. § 131 (1965)] or from adopting standards which are more restrictive." Since the state has power to adopt measures more restrictive than those in the agreement itself, Regulation 37(E)(12) is not inconsistent with the agreement.

We hold that 37(E)(12) is a valid exercise of regulatory power under which the state may acquire nonconforming devices, and we affirm the trial court.

The decisions of the trial courts are affirmed in all respects except that that portion of 14 M.C.A.R. § 1.5037(F)(4) (1980) which eliminates the width of a highway from the 100-foot measuring distance is invalidated as an unreasonable interpretation of the Act.

Affirmed in part, reversed in part and remanded.

16. The Federal Highway Administrator of the United States Department of Transportation and the State Commissioner of Highways entered into an Agreement on November 18, 1971, the purpose of which is to carry out national policy relative to the control of outdoor advertising in areas adjacent to federally funded highways.