Clayton L. GOWARD, Respondent,

v.

CITY OF MINNEAPOLIS, Appellant.

No. C0–89–2164.

Court of Appeals of Minnesota.

May 29, 1990.

Mark R. Anfinson, Charles J. Rethwisch, Minneapolis, for respondent.

Robert J. Alfton, Minneapolis City Atty., Michael T. Norton, Asst. City Atty., Minneapolis, for appellant.

Considered and decided by SHORT, P.J., and NORTON and MULALLY,* JJ.

## OPINION

SHORT, Judge.

The City of Minneapolis appeals from an order of the trial court enjoining enforcement of part of its municipal code against respondent Clayton Goward. Respondent brought this action for injunctive relief when the city threatened to prosecute him for erecting signs on his residential property criticizing the city government. The signs violated city code provisions for areas zoned for residential use. We affirm.

## FACTS

No facts are in dispute. Respondent has owned his present home since 1959. He converted the house into a duplex in 1960. In 1963, the city rezoned the property to a single family residential district. Respondent's duplex became a nonconforming use,

---

\* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

which could not be enlarged without city permission. Over the next 20 years, respondent made numerous changes to the home. Respondent obtained permits from the city on five occasions. However, respondent made several changes without obtaining permits. This work included an 8' by 10' addition to the front of the second story; a bay window on the east side of the second story; an enclosed room on the back side of the second story; and an open deck on the front of the third story.

In 1985, city inspectors cited respondent for expanding the nonconforming use without city permission. Respondent pled guilty to these charges. The city also brought an action to compel respondent to remove the expansions. The parties eventually reached an agreement which called for respondent to remove most of the room at the back of the second story. The other alterations were permitted to remain. The parties reduced this agreement to an order and judgment in July of 1987. No appeal was taken, and both parties complied fully with the terms of the judgment.

In October of 1987, however, respondent erected several large signs in his yard and attached more to his house. Some of the signs facing the street contained the following messages:

Watch my prediction: The Minneapolis Department of Inspections and the City Attorneys Office will quickly force me to remove these signs. Why? 1. The truth in my signs embarrasses them. 2. My signs could muster sympathy for my cause.

Attention: Minneapolis Dept. of Inspections; City Attorneys Office; My dear neighbor: You have made my life a living hell for the last two years!

Drive up the back alley & see what man's inhumanity to man has done to my home.

To the tree house builder in St. Louis Park: Let's join forces against those who are trying to destroy us.

I have been ordered to demolish part of my home or go to jail! Is this democracy and the United States Constitution at work?

If you have had a cruel and unpleasant experience with the Department of Inspections or with a hateful neighbor, please call or write to me: Clayton Goward.

The Minneapolis Department of Inspections and a hateful neighbor have forced me to demolish a beautiful addition on my home which has cost me $50,000 and two trips to the hospital. The same or worse could happen to you.

Are you thinking of buying your own home? Don't do it! Your home is not your castle. Owning a home could become a disaster to you.

Two signs were attached to the back of the house. One of them stated:

This was once my beautiful great room; complete with carpeting & beautiful curtains. Is it nothing to you all ye who pass by?

A few days later, the city informed respondent the signs violated the city code and had to be removed. Respondent apparently was permitted to retain the signs for an additional five days and was then required to remove them. Respondent commenced this action seeking declaratory and injunctive relief from the city's enforcement of the sign ordinance. The city concedes it would enforce the ordinance against respondent if he reinstalled the signs.

Respondent stated in deposition that he did not attempt to use any other means to communicate his grievance to the public. Specifically, he did not write to the newspapers; he did not protest before city hall or city council; and he did not buy advertising space in any newspaper. However, a newspaper article about respondent's problems was published in the Minneapolis Star Tribune on October 16, 1987. The article included a photo of respondent with some of his signs.

The trial court declared the following Minneapolis ordinance unconstitutional:

538.180. Signs. In R1 District the following nonflashing, nonilluminated signs are permitted under the conditions specified:

(A) NAMEPLATE AND IDENTIFI-
CATION SIGNS

(1) Area and content—Residential.
There shall be not more than one name-
plate—not exceeding one square foot in
area—for each dwelling unit, indicating
the name and address of the occupant or
a permitted occupation. On a corner zon-
ing lot two (2) such nameplates for each
dwelling unit—one facing each street—
shall be permitted.

(2) Area and content—Nonresidential.
For nonresidential buildings a single
identification sign—not exceeding nine
(9) square feet in area—indicating only
the name and address of the building
may be displayed. On a corner zoning
lot two (2) such signs—one facing each
street—shall be permitted.

(3) Projection. All signs shall be fixed
flat to the surface of the building.

(4) Height. No sign shall project higher
than one story, or fifteen (15) feet above
curb level, whichever is lower.

(B) "FOR SALE" AND "TO RENT"
SIGNS

(1) Area and number. There shall be not
more than one such sign per zoning lot,
except that on a corner zoning lot two (2)
signs—one facing each street—shall be
permitted. No sign shall exceed twelve
(12) square feet in area nor be closer
than eight (8) feet to any other zoning
lot.

(2) Projection. No sign shall project be-
yond the property line into the public
way.

(3) Height. No sign shall project higher
than one story or fifteen (15) feet above
the curb level whichever is lower.

(C) SIGNS ACCESSORY TO PARK-
ING AREAS

(1) Area and number. Signs designating
parking area entrances or exits are limit-
ed to one sign for each exit or entrance,
and to a maximum size of two (2) square
feet each. One sign per parking area
designating the conditions of use or iden-
tity of such parking area and limited to a
maximum size of nine (9) square feet,
shall be permitted. On a corner zoning

lot two (2) such signs—one facing each
street—shall be permitted.

(2) Projection. No sign shall project be-
yond the property line into the public
way.

(3) Height. No sign shall project higher
than seven (7) feet above curb level.

Minneapolis, Minn., Code of Ordinances
§ 538.180(A)–(C) (1987).

The city code contains other provisions
for political campaign signs:

522.300. Signs. (a) Permanently af-
fixed. All signs shall be permanently
affixed to the ground or a structure.
Portable signs are not authorized.

(b) Political campaign signs. Political
campaign signs are authorized in all dis-
tricts. Subsection (b) shall not be con-
strued as authorizing any such signs on
public property or on private property
where otherwise prohibited.

Minneapolis, Minn., Code of Ordinances
§ 522.300 (1983).

109.60. Political campaign signs. Not-
withstanding any other provision of this
Code to the contrary, no license or permit
shall be required for the placing of tem-
porary political campaign signs not more
than thirty-two (32) square feet in area
where the placing of such signs is autho-
rized by the zoning ordinance. Lawn
signs shall be removed six (6) days after
a general election.

Minneapolis, Minn., Code of Ordinances
§ 109.60 (1981). Respondent's signs do not
fall into any of the permitted categories.
There is no dispute that the ordinance pro-
hibits respondent from posting his signs.

ISSUE

Does enforcement of Minneapolis, Minn.,
Code of Ordinances § 538.180 (1987) vio-
late respondent's first amendment right
of free speech?

ANALYSIS

■ On appeal from summary judgment,
this court's role is to determine whether
any genuine issues of material fact exist,
and whether the trial court correctly ap-
plied the law. *Offerdahl v. University of*

*Minnesota Hospitals & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). The nonmoving party has the burden of producing evidence as to all material facts for which it bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Carlisle v. City of Minneapolis*, 437 N.W.2d 712, 715 (Minn.App.1989). The ordinary presumption of constitutionality afforded legislative enactments does not apply to laws restricting first amendment rights. *Johnson v. State Civil Service Department*, 280 Minn. 61, 66, 157 N.W.2d 747, 751 (1968). The burden of proving a need for such a law is on the government. *Id; see also Meyer v. Grant*, 486 U.S. 414, 426, 108 S.Ct. 1886, 1894, 100 L.Ed.2d 425 (1988).

■ The city seeks deference to its broad powers to enact zoning ordinances. The city's power to zone, however, is limited by express constitutional and statutory provisions. Our standard of review is determined not by the power exercised by the city, but by the rights allegedly infringed by the city's action. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981). Respondent's signs vent his criticism of city action. Such political speech is at the core of first amendment protection, and the city must "allow the widest room for discussion, the narrowest range for its restriction." *See Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945).

■ An ordinance restricting the time, place or manner of speech will survive constitutional scrutiny only if (1) it is justified without reference to the content of the regulated speech; (2) it is narrowly tailored to serve a significant governmental inter-est; and (3) it leaves open ample alternative channels for communication of the information. *Ward v. Rock Against Racism*, —— U.S. ——, ——, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989).[1] The time, place or manner analysis has been routinely applied in cases involving zoning laws restricting speech on privately-owned property. *See, e.g., City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986) (adult films shown in privately-owned theatres); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 515–16, 101 S.Ct. 2882, 2896–97, 69 L.Ed.2d 800 (1981) (plurality opinion) (billboards containing commercial speech located on private property); *Schad*, 452 U.S. at 74–76, 101 S.Ct. at 2185–2186 (live nude dancing); *State v. Hopf*, 323 N.W.2d 746, 753 (Minn.1982) (advertising devices near churches, schools, and scenic areas). We thus analyze each requirement in turn.

1. Content Neutrality.

■ In determining whether a government regulation is content-neutral, the government's purpose is the controlling consideration. *Rock Against Racism*, —— U.S. at ——, 109 S.Ct. at 2754. The regulation is content-neutral if it is justified without reference to the content of the regulated speech. *Id.* A regulation that serves purposes unrelated to the content of expression is neutral, even if it has an incidental effect on some speakers or messages but not others. *Id.* Here, the governmental objective the city asserts is to preserve the appearance of residential neighborhoods by reducing the visual clutter caused by signs. This objective is unrelated to the content of the signs.

The ordinance contains exceptions, however, which permit certain signs based solely on the speech contained on them. For

---

1. The test articulated in *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) is somewhat different:

[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the inci-dental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

466 U.S. at 805, 104 S.Ct. at 2128 (quoting *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968)). These two tests appear to have become interchangeable. *See* Day, *The Hybridization of the Content–Neutral Standards for the Free Speech Clause*, 19 Ariz.St.L.J. 195, 215 (1987).

example, the ordinance permits "for sale" and "for rent" signs, and temporary political signs relating to a campaign. We must determine whether these exceptions take the otherwise content-neutral ordinance out of the domain of time, place or manner regulations.

In *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), the Supreme Court said:

An assertion that "Jesus Saves," that "Abortion is Murder," that every woman has the "Right to Choose," or that "Alcohol Kills," may have a claim to a constitutional exemption from the ordinance that is just as strong as "Roland Vincent—City Council." To create an exception for appellees' political speech and not these other types of speech might create a risk of engaging in constitutionally forbidden content discrimination.

466 U.S. at 816, 104 S.Ct. at 2134 (citation omitted). By placing a higher value on certain topics of political speech than on other topics, the city impermissibly sets the agenda for public debate. *See Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 537–38, 100 S.Ct. 2326, 2333–34, 65 L.Ed.2d 319 (1980); *Police Department of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972); *see also* Note, *The Content Distinction in Free Speech Analysis After Renton*, 102 Harv.L.Rev. 1904, 1913 (1989) ("[S]ubject matter restrictions distort the process of self-government and the search for truth—the norm ultimately underlying the marketplace of ideas." (footnote omitted)).

Regulations that distinguish between subjects of speech on their face often have a viewpoint discriminatory effect. *See* Barnes, *Regulations of Speech Intended to Affect Behavior*, 63 Den.U.L.Rev. 37, 53–54 (1985); Schauer, *Categories and the First Amendment: A Play in Three Acts*, 34 Vand.L.Rev. 265, 284–85 (1981); Stone, *Restrictions of Speech Because of Its Content: The Peculiar Case of Subject–Matter Restrictions*, 46 U.Chi.L.Rev. 81, 109–11 (1978). This is true because political

speech in some forums is most often critical of the status quo. An impartial ban thus has the effect of suppressing viewpoints critical of the government.

■ By permitting campaign-related signs while banning signs on such political issues as abortion, taxes, and gun control, the city ordinance falls into the dilemma noted in *Taxpayers for Vincent*. The city is providing a forum to people whose choice of topic it finds acceptable, but is denying that forum to less favored or less flattering topics, such as respondent's criticism of city action.

The plurality in *Metromedia, Inc.* said:
Although the city may distinguish between the relative value of different categories of commercial speech, the city does not have the same range of choice in the area of noncommercial speech to evaluate the strength of, or distinguish between, various communicative interests.

453 U.S. at 514, 101 S.Ct. at 2896. The plurality concluded that:
With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse: "To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth."

*Id.* at 515, 101 S.Ct. at 2896 (citation omitted). Such subject-based restrictions make the ordinance content-based. *Id.* at 516–17, 101 S.Ct. at 2897–98. We hold that the exception for campaign-related signs renders the ordinance content-based. Further, the exception in the city's ordinance which allows "for sale" and "for rent" signs impermissibly inverts first amendment values. The city may not treat commercial speech more favorably than political speech. *See id.* at 513, 101 S.Ct. at 2895.

Other jurisdictions which have considered similar ordinances have uniformly held a city may not select a particular type of speech for differential treatment. *See, e.g., National Advertising Co. v. City of Orange*, 861 F.2d 246, 249 (9th Cir.1988) (city cannot analyze content of outdoor noncommercial messages to determine

whether and where they are allowed); *Baldwin v. Redwood City*, 540 F.2d 1360, 1372–73 (9th Cir.1976) (ordinances which exclude political signs from residential districts held unconstitutional), *cert. denied*, 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977); *National Advertising Co. v. Town of Babylon*, 703 F.Supp. 228, 237 (E.D.N.Y. 1989) (an ordinance does not pass constitutional muster if it favors any type of commercial speech over noncommercial speech), *aff'd in part*, 900 F.2d 551 (2d Cir.1990); *Ross v. Goshi*, 351 F.Supp. 949, 954 (D.Haw.1972) (ordinance prohibiting political signs held unconstitutional); *City of Lakewood v. Colfax Unlimited Association*, 634 P.2d 52, 62 (Colo.1981) (ordinance limiting permissible messages borne by political signs is unconstitutional); *New Jersey v. Miller*, 83 N.J. 402, 413–14, 416 A.2d 821, 827 (1980) (ordinance which limited residential property owner's communication constitutes an absolute ban on political speech); *Peltz v. City of South Euclid*, 11 Ohio St.2d 128, 133, 228 N.E.2d 320, 323 (1967) (ordinance prohibiting political signs impermissibly bars a property owner from expressing his opinion on his own property); *City of Euclid v. Mabel*, 19 Ohio App.3d 235, 238, 484 N.E.2d 249, 253 (1984) (ordinance which regulates on the basis of subject matter is invalid on its face), *cert. denied*, 474 U.S. 826, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985); *Van v. Travel Information Council of Oregon*, 52 Or.App. 399, 415, 628 P.2d 1217, 1227 (1981) (ordinance which contains time limitations on political signs impermissibly restricts the scope of political speech).

■ Appellant concedes the ordinance cannot survive the strict scrutiny applied to content-based restrictions on political speech. Content-based restrictions on speech survive first amendment scrutiny only if they are necessary to serve a compelling state interest and are narrowly drawn to achieve that end. *Widmar v. Vincent*, 454 U.S. 263, 270, 102 S.Ct. 269, 274, 70 L.Ed.2d 440 (1981). We are not

aware of any case that holds a city's interest in aesthetics is compelling. We hold aesthetic interest alone cannot be a compelling state interest. The ordinance also fails the remaining requirements of the time, place and manner test.

2. Narrowly tailored to meet significant governmental interest.

■ Aesthetic concerns are a significant governmental interest that may justify banning billboards and signs. *See Taxpayers for Vincent*, 466 U.S. at 806–07, 104 S.Ct. at 2129–30; *Hopf*, 323 N.W.2d at 754; *City of Cottage Grove v. Ott*, 395 N.W.2d 111, 113–14 (Minn.App.1986). The city ordinance prohibiting respondent's signs, while arguably serving that interest,[2] contains no statement of a significant governmental interest, nor has the city offered extrinsic evidence of such an interest. In essence, the city seeks judicial notice of an unstated and unexplained legislative purpose for an ordinance that restricts speech. *See National Advertising Co. v. Town of Babylon*, 900 F.2d 551, 556 (2d Cir.1990). It is true that the Minneapolis zoning code as a whole was adopted, in general, for the purpose of promoting and protecting the public health, safety, morals, comfort, aesthetics, economic viability and general viability of the city. *See* Minneapolis, Minn., Code of Ordinances, § 522.20 (1986). This does not demonstrate that the rationale behind the enactment of the sign ordinance was aesthetics. *See National Advertising Co.*, 900 F.2d at 555. We cannot accept the city attorney's statement that aesthetics was the city's motivating purpose where the record was silent on that point. *See Dills v. City of Marietta*, 674 F.2d 1377, 1381 (11th Cir.1982), *cert. denied*, 461 U.S. 905, 103 S.Ct. 1873, 76 L.Ed.2d 806 (1983). The onus of proving a need for a law burdening speech falls on the city. *Grant*, 486 U.S. at 426, 108 S.Ct. at 1894. Because the city sign ordinance does not identify the particular governmen-

---

**2.** In a counterclaim, the city sought injunctive relief and attorney fees from respondent for "collaterally attacking" the prior settlement by the use of signs. The counterclaim suggests the city's true concern in enforcing the ordinance was its disapproval of the messages contained on the signs.

tal interests sought to be advanced and the city has otherwise failed to present extrinsic evidence of the interests underlying the ordinance, the city has not established a basis for an ordinance restricting speech.

Except for *Taxpayers for Vincent*, the cases holding that aesthetic interests can constitute a significant governmental interest involved "semi-protected" speech. Quadres, *Content–Neutral Public Forum Regulations: The Rise of the Aesthetic State Interest, The Fall of Judicial Scrutiny*, 37 Hastings L.J. 439, 443–47 (1986). The city in *Taxpayers for Vincent* had the additional interest of traffic safety, an interest not asserted here. The city there also had a greater interest in controlling the forum because it was government-owned and not normally available as a public forum. 466 U.S. at 814, 104 S.Ct. at 2133. Here respondent has an interest in using his own property as he sees fit. The city has a correspondingly lesser interest in controlling speech on private property. *Id.* at 811, 104 S.Ct. at 2132. The Supreme Court has never held that aesthetic interests alone can constitute a governmental interest significant enough to override political speech on property owned by the speaker. We hold it cannot.

### 3. Alternative channels.

The governmental regulation must leave open ample alternative channels for communicating the information. The city argues respondent could communicate his message through such means as letters to the editor, picketing at city hall, or handbilling. However, the issue is not merely whether alternative forums exist, but whether the alternative forums are adequate. *Taxpayers for Vincent*, 466 U.S. at 812, 104 S.Ct. at 2132. The Supreme Court has stated:

> That [a regulation] leaves open "more burdensome" avenues of communication, does not relieve its burden on First Amendment expression. The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing.

*Grant*, 486 U.S. at 424, 108 S.Ct. at 1893 (citations omitted).

Several cases have held that notwithstanding the regulation, ample alternative channels of communication remained open. *See Rock Against Racism*, ―― U.S. at ――, 109 S.Ct. at 2760; *Frisby v. Schultz*, 487 U.S. 474, 483–84, 108 S.Ct. 2495, 2501–02, 101 L.Ed.2d 420 (1988); *Playtime Theatres, Inc.*, 475 U.S. at 53–54, 106 S.Ct. at 931–932; *Taxpayers for Vincent*, 466 U.S. at 812, 104 S.Ct. at 2132; *Hopf*, 323 N.W.2d at 754. These cases involved relatively minor interference with the right to speak. *Rock Against Racism*, for example, involved a city requirement that a city-supplied technician control the sound at concerts given in a public band shell. The Court held the law had "no effect on the quantity or content of that expression." ―― U.S. at ――, 109 S.Ct. at 2760. Similarly, in *Frisby*, the city enacted an ordinance banning picketing in front of residences. As the Court construed it, the ordinance allowed general marching through the neighborhoods, or around the block. 487 U.S. at 483–84, 108 S.Ct. at 2501–02. As narrowed, the ordinance therefore left open ample alternatives. In *Playtime Theatres, Inc.*, the city had banned adult movie theaters from locating within 1,000 feet of residential and other zones. The Court held ample alternatives remained open because 520 acres of accessible real estate remained available. 475 U.S. at 53–54, 106 S.Ct. at 931–932. In *Taxpayers for Vincent*, the city had banned posting signs on public property. The Court noted that ample alternative modes of communication remained, and that no findings indicated that the posting of political signs on public property is "a uniquely valuable or important mode of communication, or that appellees' ability to communicate effectively is threatened." 466 U.S. at 812, 104 S.Ct. at 2132. Finally in *Hopf*, the Minnesota Supreme Court held that an ordinance banning billboards within 100 feet of churches and schools left open ample alternative channels of communication. 323 N.W.2d at 754.

These cases all have a common thread: the regulations did not impair the ability of

the speaker to communicate the message to the desired audience. In contrast, a regulation that leaves open no adequate alternative channels must fail. *See Grant*, 486 U.S. at 424, 108 S.Ct. at 1893; *Metromedia, Inc.*, 453 U.S. at 516, 525, 101 S.Ct. at 2897, 2901 (plurality and concurring opinions); *Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 654–55, 101 S.Ct. 2559, 2567–68, 69 L.Ed.2d 298 (1981); *Schad*, 452 U.S. at 75–77, 101 S.Ct. at 2186–2187; *Linmark Associates, Inc. v. Township of Willingboro*, 431 U.S. 85, 93, 97 S.Ct. 1614, 1618, 52 L.Ed.2d 155 (1977).

These cases expressly reject the view that a law that limits expression can be justified merely on the ground that the expression can be exercised elsewhere. *Schad*, 452 U.S. at 76–77, 101 S.Ct. at 2186–2187. The cases recognize that signs are a cheap, effective and autonomous method of communication. *See Metromedia, Inc.*, 453 U.S. at 516, 101 S.Ct. at 2897; *see also Hopf*, 323 N.W.2d at 754 ("[t]he billboard is a unique advertising device which cannot easily be replaced by newspapers, television, leaflets and the like."). In *Linmark Associates, Inc.*, the Supreme Court held that a lawn sign advertising the fact that the house was for sale was a unique form of expression, for which no adequate alternative existed. 431 U.S. at 93, 97 S.Ct. at 1618. The Court noted that such signs are most likely to reach the audience to which the message is directed. *Id.*

We think the messages contained on respondent's signs are so closely connected to their location that no adequate alternative means of communication exists. The signs invite passers by to look at the house, and to consider whether the city treated respondent in a humane fashion. The same message communicated any place other than the house would carry little impact.

■ The city's lawn sign ordinance amounts to a total ban on a form of political expression. Despite the narrow exception for campaign-related signs, the first amendment does not permit such a law because it fails to leave open adequate

channels of communication. *See Schad*, 452 U.S. at 76, 101 S.Ct. at 2186 (total ban on live entertainment does not leave adequate alternative channels). We have previously held that a total ban on commercial billboards is permissible. *See Ott*, 395 N.W.2d at 114. That decision was premised on the fact that the ordinance in question did not reach noncommercial speech. *Id.* Noncommercial speech, the type at issue in the present case, is at the zenith of first amendment protection. *Grant*, 486 U.S. at 425, 108 S.Ct. at 1893–94. Therefore, we hold that the near-total ban on noncommercial lawn signs in residential zones violates the first amendment. Our holding does not prevent the city from enacting reasonable ordinances limiting sign dimensions, establishing setback requirements, and so forth.

### DECISION

The Minneapolis ordinance is not a valid time, place, or manner restriction on speech because (a) it is content-based; (b) the city has failed to show a significant governmental interest underlying the ordinance; and (c) the ordinance does not leave open adequate alternative channels. Because we find the ordinance violates respondent's first amendment right of free speech, we affirm the trial court's ruling that the ordinance is unconstitutional.

Affirmed.