AFSCME COUNCILS 6, 14, 65 AND 96, AFL–CIO, Plaintiffs-Appellants,

v.

Barbara L. SUNDQUIST, Commissioner of Employee Relations; Allen Rudell, Commissioner of Finance; and the State of Minnesota, Defendants-Respondents,

and

The Minneapolis Police Relief Association; the Minneapolis Fire Department Relief Association; the Minnesota Federation of Teachers, AFL–CIO; the Minnesota Police and Peace Officers Association; the Minneapolis Employees Retirement Board; Minnesota Professional Firefighters Association, AFL–CIO; Duluth Police Pension Association; Duluth Police Union, AFL–CIO; Police Officers Federation of Minneapolis; Minnesota Firefighters Joint Pension Council; Minneapolis Retired Police Association; Rochester Police Relief Association; Minnesota Police Pension Council; Minnesota Education Association; Minnesota Teamsters Public and Law Enforcement Employees Union, Local No. 320; St. Paul Police and Firefighters Relief Associations, Minnesota Association of Professional Employees, Intervenors-Appellants,

and

International Union of Operating Engineers, Local 49, Amicus Curiae.

Nos. C1–83–152, C8–83–164, C1–83–166, C3–83–167 and C5–83–168.

Supreme Court of Minnesota.

Sept. 16, 1983.

Rehearing Denied Nov. 22, 1983.

Gregg Corwin, Russell J. LaCourse, St. Louis Park, for AFSCME.

Roger A. Peterson, Minneapolis, for Mpls. Police Relief Ass'n, et al.

Eric R. Miller and John Tunheim, St. Paul, for Minn. Educ. Ass'n.

Jeffrey W. Jacobs, Minneapolis, for Minn. Teamsters Public and Law Enforcement Employees Union.

Joseph T. O'Neill, O'Neill, Burke & O'Neill, St. Paul, for St. Paul Police Relief Ass'n.

Gregg Corwin, St. Louis Park, for Minn. Ass'n. of Professional Employees.

Hubert H. Humphrey, III, Atty. Gen., Richard Allyn, Chief Deputy Atty. Gen., Peter M. Ackerberg, Asst. Atty. Gen., St. Paul, for Sundquist, et al.

Bruce A. Finzen, St. Paul, for amicus Intern. Union of Operating Engineers.

Julia Penny Clark, Robert H. Chanin, Bredhoff & Kaiser, Washington D.C., for amicus Nat. Educ. Ass'n.

AMDAHL, Chief Justice.

This litigation challenges the validity of legislation passed by the Minnesota Legislature on December 10, 1982, and signed into law by Governor Albert H. Quie on December 13, 1982. Act of December 10, 1982, 3rd Spec.Sess. ch. 1, 1982 Minn.Sess. Law Serv. 1819 (the "Act"). On that same day, various parties, representing public employees affected by the terms of the Act, petitioned this court for a writ of quo warranto in an effort to prevent the enforcement of the Act. Finding that this case did not present the type of controversy which fits within the nature of quo warranto, this court issued an order, on December 20, 1982, denying the petition and remanding the case to a special three-judge district court panel for an expedited hearing. The panel consisted of retired District Court Judges Archie L. Gingold, Gordon L. McRae and Bruce C. Stone.

In conjunction with the filing of their amended complaint on December 23, 1982, appellants brought a motion for a temporary injunction seeking to immediately restrain that part of the Act increasing government employees' existing contributions to the pension funds by 2%.[1] On December 30, 1982, the trial court denied appellants' motion for a temporary injunction and set the case for trial on January 6, 1983. Thereafter, on January 24, 1983, the trial court issued its findings of fact, conclusions of law and order for judgment dismissing plaintiffs' complaint. On that same day, a notice of appeal from the order and judgment of the trial court was filed with this court.

The Act was written and passed upon rather short notice in response to an imminent, and very serious, fiscal crisis facing the government of the State of Minnesota. Governor Quie called the Third Special Session of the 72nd Legislature in early December 1982 to address an anticipated short fall in state revenue of approximately $312,000,000.[2] This substantial anticipated

---

1. The original plaintiffs in this action were the American Federation of State, County and Municipal Employees Councils 6, 14, 65 and 96, and the Minnesota Association of Professional Employees. On December 27, 1982, the International Union of Operating Engineers, Local 49 and Law Enforcement Labor Services, Inc., filed a motion for leave of court to file a brief *amicus curiae.* That motion was granted by the court. Shortly thereafter, approximately 15 other public employee organizations were permitted to intervene as plaintiffs. In all,

there are approximately 235,000 public employees participating in public pension plans in Minnesota.

2. Governor Quie first received the news of this latest shortage in anticipated revenues on November 18, 1982, although preliminary warnings of it were available in early November in the reports compiled from the October revenue figures. Upon receiving this news, Governor Quie consulted with legislative leaders and a

deficit was the latest of six distinct financial crises which have been faced by Minnesota government since July of 1980.[3]

Three major factors operated to further accentuate the severity of the crisis and the need for a swift legislative response. First, the crisis was compounded by the fact that local government aids and homestead credits in excess of $1,000,000,000 were due to be paid by the state to Minnesota cities and counties in mid-December 1982. A second factor emphasizing the immediacy of the need for remedial attention was the state's obligations for $930,000,000 in short term certificates of indebtedness. These certificates were recently issued by the state to alleviate a severe cash flow problem, and contained convenants which gave unqualified priority to an impoundment schedule, commencing February 1, 1983, established to assure the satisfaction of the indebtedness upon maturity in June 1983. An additional pressure for an expeditious legislative response to this crisis was exacted by a statutory provision requiring the Commissioner of Finance to "unallot," or withhold the payment of, appropriated funds when projected revenues are insufficient to meet the state's expenses. Minn.Stat. § 16A.15, subd. 1(b) (1982). Unallotment would result in drastic cuts in funding to public agencies which, because 75–80% of the funds allotted to public agencies are appropriated for personnel costs, would fall most heavily on public employees. When viewed in this fiscal context, and against the backdrop of the measures already taken in response to previous revenue shortfalls, it is evident that this revenue shortfall did indeed present a crisis.

Although the Act effects a number of tax increases, spending cuts and spending shifts, the only portion of the Act challenged in this action are the provisions impacting upon the terms of public employees' employment, primarily the provision regarding public employees' pension contributions.[4] In relevant part, the Act requires that, beginning with the first full pay period after December 28, 1982, various state, county and municipal employees are required to pay an additional 2% of their salaries into their respective pension funds. This increase in employee contributions is limited in duration to the last pay period before January 1, 1984; then the preexisting formula returns. The Act also requires that, beginning with the first full pay period after December 28, 1982, and continuing until the last full pay period before July 1, 1983, employer contributions to the pension funds equal to 4 percent of salary are to be either diverted from the pension funds and credited to the general fund, or deferred altogether and not paid to the funds. It is projected that these reductions in employer contributions will save the state approximately $63,000,000. In addition, the Act provides that, until June 30, 1983, state employees who choose to go on unpaid leaves of absence may continue to accrue most fringe benefits as if they had been working during their leave periods. The Act also contains provisions which raise issues of federal taxation, the most important of which is a provision to reduce the federal adjusted gross income of public employees by the amount of their employee contributions.[5]

determination was made to convene a special legislative session.

3. At trial, the State Budget Director testified that, prior to the enactment of the Act, the legislature had responded to the first five of the financial crises since July 1980 by enacting $1,223,000,000 worth of tax increases, $688,000,000 worth of accounting changes that shifted current obligations into subsequent accounting periods, and approximately $500,000,000 in spending cuts.

4. In addition to the Act's provisions regarding pension contributions and other terms of public

employment, the legislature also reduced appropriations to state agencies, reduced education aids, reduced aids to local units of government and increased income taxes.

5. In order to understand the issues concerning the tax implications of the Act, it is necessary to have a general understanding of the taxation of retirement plans. The subject public employee pension plans have long been treated as "qualified" pension plans within the meaning of I.R.C. § 401. Qualified retirement plans have very favorable tax consequences. The qualified plans at issue include both employer

The issues presented by this appeal can be grouped into four broad categories: (1) contract clause issues; (2) equal protection and uniformity clause issues; (3) due process issues; and (4) unfair labor practice issues.

## 1. CONTRACT CLAUSE ISSUES

Appellants argue that the Act unconstitutionally impairs contractual obligations between public employers and employees regarding the level of public employee pension contributions.[6] This court recently addressed the issue of the nature of a public employee's interest in a public pension or retirement plan and the degree to which that interest is afforded constitutional protection. In *Christensen v. Minneapolis Municipal Employees Retirement Board,* 331 N.W.2d 740 (Minn.1983), we abandoned the gratuity approach in analyzing such issues in favor of an expanded contract approach. Recognizing that a conventional contract approach, with its strict rules of mutuality, can seldom operate to provide protection for specific, legitimate interests of public employees in this context, the *Christensen* case augmented the contract approach to include the closely related doctrine of promissory estoppel. *Id.* at 747. Under *Christensen,* public employees can challenge changes affecting their interests in a public pension plan under the contract clause by establishing their right to the maintenance of the preexisting terms or conditions as a matter of either express contract, implied-in-fact contract, or promissory estoppel.[7]

In the case at bar, appellants advance each of these theories in arguing that the Act unconstitutionally impairs contractual obligations between public employers and employees regarding the level of public employee pension contributions. We conclude that no contract or contract term, express or implied, existed between public employ-

and employee contributions. The employee contribution is made from adjusted gross income, and is therefore not immediately deductible. However, both the employer contributions and the income generated by the pension corpus are tax deferred, and the only taxable event occurs when proceeds exceeding the amount of an employee's actual contributions are distributed to the employee. *See generally* Canan, *Qualified Retirement Plans* § 3.1 (1977).

The primary tax benefit created by the Act is a provision which directs that the entire employee pension contribution be "picked up" by the employer and thereby treated for tax purposes as an employer contribution. This provision provides a substantial benefit to public employees to offset the effects of the temporary increase in employee contributions. Prior to the Act, employees made contributions to their individual pension accounts from their adjusted gross income, and their payments were therefore made from after-tax earnings. Under the Act's employer "pick up" provisions, the employee contributions will be treated as an employer contribution and each employee's gross income for federal (not state) tax purposes will be reduced by the amount of the contribution. This "pick up" provides significant benefits to employees: first, the employee's annual federal tax liability will be reduced and there will be a corresponding reduction in the amount of federal taxes withheld from an employee's net earnings; second, no tax will be paid on this money until the employee draws it out upon retirement, at which point the employee is often in a lower tax bracket. The

most beneficial aspect of this provision, however, is that it applies to the employee's entire contribution, not just the additional 2%, and that the provision is a permanent benefit, and not just effective until the expiration of the additional 2% contribution on December 31, 1983. Although the effect of this pick up will vary considerably among different employees, in general it seems clear that the long-term tax benefits of this provision will operate to fully compensate employees for the payment of an additional 2% in 1983. The I.R.S. recently issued a private letter ruling which approved this tax shelter provision under I.R.C. § 414(h).

6. The appellants' claims are limited to the implementation of the Act as it relates to a 2% increase in public employee retirement contributions and unpaid leaves of absence. Accordingly, our review of appellants' contract clause claim is restricted to the issue of whether contractual rights or enforceable promises exist in maintaining fixed levels of employee pension contributions. This restricted inquiry is consistent with the established practice of "not decid[ing] constitutional questions except when necessary to do so in order to dispose of the case at bar." *State v. Hoyt,* 304 N.W.2d 884, 888 (Minn.1981).

7. Another contract theory available to public employees in this context is that of unilateral contract. *See, e.g., Sylvestre v. State,* 298 Minn. 142, 156–57, 214 N.W.2d 658, 667 (1973). This theory, however, is not presented by this appeal.

ers and employees which guaranteed fixed levels of employee retirement contributions to the pension funds. We further hold that the record does not support appellants' claim to a fixed level of employee pension contributions based on a theory of promissory estoppel. Because we therefore affirm the trial court's findings that appellants have failed to establish a right, based either on conventional contract or promissory estoppel theories, to a fixed level of employee pension contributions, we need not address the issue of whether the Act operates to unconstitutionally impair such a right.

 It cannot be disputed that the record contains no evidence of an express contract designating rates at which public employees must contribute to their pension funds. In the absence of an express contract, appellants argue that the legislature's promise to supply pension benefits to public employees constitutes an implied-in-fact contract to maintain employee pension contributions at a fixed level during their employment. Where the evidence does not prove the existence of an express agreement, a contract implied in fact may be established by circumstantial evidence showing a mutual intention to contract. *See Bergstedt, Wahlberg, Berquist Associates, Inc. v. Rothchild,* 302 Minn. 476, 479–80, 225 N.W.2d 261, 263 (1975). Whether a contract is to be implied in fact, and the existence of the terms of such a contract, are questions of fact to be determined by the trier of fact, and the trier's findings in this regard will not be set aside by this court unless they are found to be clearly erroneous. *Id.,* Minn.R.Civ.P. 52.01.

 Appellants urge that the pension plans themselves constitute contracts be-tween public employees and their employer, and that the maintenance of employee pension contributions at a fixed level may be implied as a term of these contracts. The trial court found, however, that a contract right to the maintenance of fixed employee contribution levels could not be implied from evidence in the record concerning the pension plans. In so finding, the trial court relied, in part, upon specific statutory provisions which greatly restrict the contract rights created by the establishment and maintenance of public pension plans. For example, in Minn.Stat. § 353.38 (1982), the legislature addressed the rights of members of the Public Employees Retirement Association by providing that:

> Nothing done under the terms of this chapter and acts amendatory thereof shall create or give any contract rights to any person, except the right to receive back upon withdrawal from the association through separation from the public services, the accumulated deductions, as by law defined, standing to his credit on the books of the association.

Similar restrictive statutory provisions exist with regard to most of the state's other major public retirement funds. *See, e.g.,* Minn.Stat. §§ 354.07, subd. 8 (teachers' retirement fund), 352.022 (1982) (state retirement fund); *see also* Minn.Stat. § 645.27 (1982) (state not bound by statute unless statute expressly provides). These statutes clearly support the trial court's conclusion that the legislature did not intend to enter into a contractual obligation with public employees concerning a particular rate of employee contributions to the pension plans.[8] We therefore affirm, as not

---

**8.** Appellants also argue that the compensation provisions negotiated in their collective bargaining agreements reflect an implied contract concerning levels of employee retirement contributions. This argument presupposes that the terms of existing agreements were agreed to by negotiators in conjunction with an agreement upon a fixed rate of employee pension contributions. As is treated more fully in the discussion concerning the unfair labor practice issues raised by this appeal, pursuant to Minn. Stat. § 179.63, subd. 18 (1982), pension issues are not a permissible subject of bargaining.

Rather, the legislative history of the Public Employees Labor Relations Act of 1971 demonstrates a clear legislative intent to retain broad discretion in determining conditions, classifications and membership in public pension plans. Minn.Stat. § 353.38 (1982), and related statutes, reflect a legislative determination to exercise this discretion with flexibility in a manner deemed by the legislature to be in the best interests of both public employees and the public generally. This court must extend considerable deference to the legislature's exercise of

clearly erroneous, the trial court's finding that no implied contract exists.

■ Relying upon the doctrine of promissory estoppel, appellants next contend that the legislature promised that their contribution levels would remain fixed throughout their contribution periods and that they relied upon that promise to their detriment. Promissory estoppel is applicable when (1) a promise has been made, (2) which the promisor expected or should have reasonably expected to induce action of a definite and substantial character by the promisee, (3) which in fact induced such action, and (4) in circumstances requiring the enforcement of the promise to avoid injustice. *See Grouse v. Group Health Plan, Inc.,* 306 N.W.2d 114, 116 (Minn.1981); Restatement (Second) of Contracts § 90 (1981). The trial court found both that the legislature made no promise regarding fixed employee pension

contribution levels and that, even if such a promise had been made, the appellants did not establish the essential element of detrimental reliance. These findings must be upheld unless they are shown to be clearly erroneous. Minn.R.Civ.P. 52.01.

■ Appellants have failed to designate evidence in the record which tends to establish that the legislature made any promise to maintain employee contributions to the pension plans at a fixed level during the contribution period.[9] To the contrary, the record shows that the state had varied contribution levels in the past within a number of the pension funds at issue and that employees were aware of such changes. Consequently, appellants were unable to produce a single witness to testify to any reliance on a fixed, unchanging level of employee contributions. This record belies the appellants' claim to promissory estoppel.[10]

that discretion. *Cf. Grossman v. Gilchrist,* 519 F.Supp. 173, 178 (N.D.Ill.1981), *aff'd,* 676 F.2d 701 (7th Cir.1982) (rationality analysis does not permit court to substitute its judgment for that of the legislature concerning conditions of participation in public employee retirements plans).

9. The provisions of the Act do not affect either the requirements for pension benefits or the levels of those benefits. Therefore, in contrast to the promise enforced in *Christensen v. Minneapolis Municipal Employees Retirement Board,* 331 N.W.2d 740 (Minn.1983), appellants concede that the Act does not affect their expectations concerning the benefits available to them upon leaving public employment. Rather, appellants' claim to promissory estoppel rests upon the allegation that they detrimentally relied upon their employer's promise to maintain employee contribution levels at a fixed rate.

10. Although it does not distinguish the independent legal standards applicable to the separate contract theories at issue, the dissenting opinion appears to rely upon the doctrine of promissory estoppel in concluding that the Act's employee pension contribution provisions are invalid. In so concluding, the dissent both fails to apply appropriate legal standards and inaccurately characterizes evidence in the record, and these omissions merit some comment.

Promissory estoppel is an equitable doctrine which is triggered by a showing of reasonable and substantial detrimental reliance upon a promise. In this action's present procedural posture, the dissent's theory can only be supported through a discussion of evidence in the

record which not only establishes the existence of both the promise and the substantial detrimental reliance, but which also is sufficiently compelling to support the determination that the trial court's findings to the contrary are clearly erroneous. The dissent's discussion fails to meet these legal standards.

Additionally, in its effort to designate the nature of the alleged promise the dissent mischaracterizes the evidence. The dissent apparently concedes that the evidence supports the trial court's finding that the legislature made no promise to maintain employee pension contributions at a fixed level. The dissent maintains, however, that the legislature's past financial management of public pensions constitutes a promise that employer contributions will always "match" (i.e., equal the amount of) employee contributions to meet normal costs, and that contributions will only be increased in conjunction with an increase in benefits. The dissent bases its analysis upon the following conclusion: "Since * * * 1957, employer contributions have matched employee contributions." The dissent also states: "Increases in contributions since the 1950's have been, in every instance, accompanied by increases in benefits." Both of these statements are inaccurate.

The record in this case clearly reflects the facts that employer contributions have not always matched employee contributions, and that contributions have been increased for purposes other than the increase of pension benefits. For example, Karen Dudley, the Executive Secretary of the Legislature's Commission on Pensions and Retirement, was quite clear in her testimony regarding these points:

In this regard, we endorse the following conclusion of the trial court:

> There is no basis for the contention that, no matter what the legislature has said, what it has done is induce employee contributors to rely on the expectation that contributions levels would remain fixed. The employee contributions, the employer contributions, and the appropriations to cover unfunded liabilities have been modified on a number of occasions in the past decade. Therefore, an employee aware enough of his or her pension contribution rate to formulate some kind of reliance interest would be aware that those contribution levels have fluctuated over time. Given that history, an expectation that contribution rates would remain fixed is patently unreasonable.

We conclude that the trial court's findings that the state made no promise regarding guaranteed levels of employee contributions, and that, even if such a promise had been made, appellants have not established that they reasonably and detrimentally re-

---

Q. I notice * * * that the [Legislative Commission on Pensions and Retirement] is recommending [in its report to the Legislature] that for regular public-employees the employee-employer should make matching contributions to meet normal costs. Has the Legislature always followed this advice?
A. No, it has not.
 * * * * * *
Q. During these years [1957–1980], has the Legislature changed benefit levels for the various plans?
A. Yes.
Q. Have they made changes in the contribution levels, both for employer and employee?
A. Yes.
Q. For the various plans?
A. Yes.
Q. Have the contribution levels of either the employer or employee always been tied to an increase in benefits?
A. No.

Ms. Dudley's testimony provides the requisite evidence to support the trial court's findings, and can be easily verified through independent research. For example, with regard to the fact that employer contributions have always matched employee contributions, see Act of March 27, 1974, ch. 289, § 20–21, 1974 Minn. Laws 442, 450–51 (amending Minn.Stat. § 354.-42 (Supp.1973) (to temporarily establish contri-

---

lied upon such a promise, are not clearly erroneous.

## 2. EQUAL PROTECTION AND UNIFORMITY CLAUSE ISSUES

Appellants argue that the Act is violative of both federal and state constitutional guarantees of equal protection and of the state constitutional guarantee of uniformity of taxation. With regard to appellants' equal protection challenge, we hold that the legislative classification at issue is rationally related to the achievement of a legitimate governmental purpose. Similarly, we reject appellants' uniformity clause challenge on the ground that public employee pension contributions are not a tax within the meaning of that constitutional provision.

It is not disputed that the standard of review applicable to this case under both the state and federal equal protection clauses is the "rational basis"[11] test. Although we have expressed this standard in

---

bution rates to the Teachers' Retirement Association of 4% for employees and 3½% for the employer), and Minn.Stat. § 352.92 (1982) (establishing contribution rates for correctional employee members of the Minnesota State Retirement System which requires the employer to pay at least 1½ times the amount contributed by the employee). Similarly, to confirm that contribution levels have been increased without an accompanying increase in benefits, see Act of May 31, 1979, ch. 293, § 1, 1979 Minn.Laws 641, 641–42 (amending Minn.Stat. § 354.42, subd. 3 (1978), to raise the employer contribution level in response to concerns of the actuary regarding funding levels, and without an accompanying increase in benefits). We can only reiterate that a careful review of the record compels the conclusion that the trial court properly denied the appellants' claim to promissory estoppel.

11. We have recognized that the standard applied to claims brought under the state equal protection clause, Minn. Const. art. I, § 2, is the same as that applied to claims brought under the federal equal protection clause, U.S. Const. amend XIV, § 1. *See State v. Forge,* 262 N.W.2d 341, 347 n. 23 (Minn.1977); *Minneapolis Federation of Teachers Local 59 v. Obermeyer,* 275 Minn. 347, 354, 147 N.W.2d 358, 363 (1966).

various ways,[12] the preeminent expression of rationality analysis under the equal protection clause is the requirement that legislative classifications make distinctions which are rationally related to legitimate legislative goals or interests. *See, e.g. Minnesota Clover Leaf Creamery Co.,* 449 U.S. 456, 461–63, 101 S.Ct. 715, 722, 66 L.Ed.2d 659 (1981); *State v. Hopf,* 323 N.W.2d 746, 753 (Minn.1982). As the United States Supreme Court recently noted, the application of this standard entails two basic inquiries:

> In determining whether a challenged classification is rationally related to achievement of a legitimate state purpose, we must answer two questions: (1) Does the challenged legislation have a legitimate purpose: and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?

*Western & Southern Life Insurance Co. v. State Board of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 2083, 68 L.Ed.2d 514 (1981) (citations omitted). At the outset, however, it must be recognized that statutes carry a presumption of constitutionality, and that it is not the role of the judiciary, in applying the rational basis standard, to question either the factual accuracy or political wisdom of the reasoning and judgments underlying the legislative enactment. *See, e.g., Estate of Petroff,* 319 N.W.2d 400, 405 n. 10 (Minn.1982); *Nelson v. Peterson,* 313 N.W.2d 580, 581 n. 2 (Minn.1981).

It is not disputed that the impetus for the Act was a sudden determination that revenues actually available to the state in meeting its budgeted obligations would be precariously less than the figure which had been relied upon from previous projections. Acting within this fiscal context and under heavy time pressures, the legislature sought to achieve a balanced corrective approach which combined tax increases, budget cuts and budget shifts in an effort to spread the impact of the effects of the legislation.[13] Thus, the purpose of the Act,

**12.** A recurring expression of this rational basis standard is the following three-part test, which operates to uphold legislative classifications if:

> (1) the classification uniformly, without discrimination, applies to and embraces all who are similarly situated with respect to conditions or wants justifying appropriate legislation;
>
> (2) the distinctions which separate those who are included within the classification from those who are excluded are not manifestly arbitrary or fanciful, but are genuine and substantial so as to provide a natural and reasonable basis in the necessity or circumstances of the members of the classification to justify different legislation adapted to their peculiar conditions and needs; and
>
> (3) the classification is germane or relevant to the purpose of the law, that is, there must be an evident connection between the distinctive needs peculiar to the class and the remedy or regulations therefor which the law purports to provide.

We first applied this three-part test in *Loew v. Hagerle Bros.,* 226 Minn. 485, 489, 33 N.W.2d 598, 601 (1948), in the context of a challenge brought under the special legislation prohibition of the Minnesota Constitution, Minn. Const. art. XII, § 1. Subsequently, we have applied the three-part test developed in *Loew* in a number of cases arising under the state and federal equal protection clauses. *See, e.g., Nelson v. Peterson,* 313 N.W.2d 580, 581 (Minn. 1981). The three-part test developed in *Loew* has also been carried over to the analogous context of challenges to tax statutes brought under the uniformity clause of the Minnesota Constitution, Minn. Const. art. X, § 1. *See, e.g., Guilliams v. Commissioner of Revenue,* 299 N.W.2d 138, 142 (Minn.1980). Some confusion has consequently arisen regarding both the propriety of applying the three-part test developed in *Loew* in these different contexts, and the degree to which our use of that test in the interpretation of the Minnesota Constitution indicates a departure from the standard of rationality analysis developed by the United States Supreme Court for application in cases arising under the federal equal protection clause. We therefore reiterate that the prohibition against arbitrary legislative action embodied in the state equal protection clause, Minn. Const., art. I, § 2, the state uniformity clause, Minn. Const. art. X, § 1. and the state special legislation clause, Minn. Const. art XII, § 1, are coextensive with those afforded by the federal equal protection clause, U.S. Const. amend. XIV, § 1.

**13.** Commenting upon the Act's legislative history, the dissent states that "the legislature did not sufficiently consider other fiscal relief measures * * *," and that "[t]here is no indication that the sought-after $63.5 million was obtainable nowhere else than from public employees' pockets." However, the record repeatedly shows, perhaps most clearly through the testimony of State Budget Director Val Vik-

as stated by the legislature, is to correct the state's grave fiscal condition without creating undue economic displacement.[14] Among the many budget cuts contained in the Act, all of which were enacted for the purpose of reducing the budget deficit by decreasing state expenditures, are those which temporarily decrease employer pension contributions. The challenged provisions which correspondingly require a temporary increase in employee pension contri-

butions were included for the purpose of preventing the undue economic dislocations which would otherwise have resulted from the significant increase in the unfunded liability of the public pension funds caused by budget cuts.[15] We conclude that these are the purposes of the challenged provisions of the Act, and that these purposes are legitimate. We therefore turn to the dispositive issue in appellants' equal protection challenge and assess the claim that, in

manis who was the primary official of the executive branch informing the legislature of the options available to it in responding to the fiscal crisis, that the legislature considered enacting a number of different combinations of the following measures: unallotment (which was originally proposed as a 28.6% across-the-board reduction in available appropriations), raising the sales tax, raising the surtax on individual income, budget shifts such as shifting the recognition of revenue from property taxes to delay the payment of state aids to school districts, reducing contributions to the pension funds, reducing local government aids, reducing school aids, and reducing the budgets of all state agencies. The record is clear in demonstrating that the legislature carefully considered each of these fiscal relief measures, and that in doing so the legislature also reviewed the merits of proposals to meet the deficit through different combinations of these measures. Apparently it should be emphasized that we are reviewing the limited question of the extent of the legislature's authority, and that it is not our role to make determinations regarding the economic efficiency or political effect of the legislative enactment.

14. In challenges to statutes under the equal protection clause, we accept legislative expressions regarding the purposes of the legislation as the actual purposes unless our review of the legislative history and the statutory scheme convinces us that they "could not have been a goal of the legislation." *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 463 n. 7, 101 S.Ct. 715, 723 n. 7, 66 L.Ed.2d 659 (1981) (*quoting Weinberger v. Wiesenfeld,* 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514 (1975).) Here, a review of the legislative history and the statutory scheme confirms that the purposes stated in the Act's preamble are its actual purposes.

In its Preamble, the Act states that Minnesota "is presently confronted with a grave economic emergency" and that "legislation designed to correct this economic emergency must not create undue economic or social dislocations, place an oppressive tax burden on the state's citizens and corporate community, cause mas-

sive expenditure reductions which would eliminate basic public services, cause further extensive unemployment, or jeopardize the financial integrity of state government." Act of December 10, 1982, 3rd Spec.Sess. ch. 1, art. 1, § 1, 1982 Minn.Sess. Law Serv. 1819, 1820.

15. The budget crisis was a "no-win" situation in the sense that it presented the legislature with only unsavory alternatives. Because of the vast size of the deficit, and because personnel costs constitute approximately 75 to 85% of the state budget, it was apparent that any substantial budget cuts would dramatically affect public employees in some manner. Once the political decision was made to enact budget cuts as a part of the legislative response to the deficit, the alternative of reducing employer pension contributions was explored. Because of the state's strong reliance upon debt financing and in recognition of the prominent role which the state's recent efforts to reduce the unfunded liabilities in its pension plans has played in the favorable opinions of agencies which rate the credit of state and local units of government, the Legislature had to ensure that a decrease in employer pension contributions would not have an unfavorable impact upon the state's credit rating. Moreover, there was considerable concern that a $64,000,000 reduction in pension contributions would cause too much damage to the actuarial soundness of the plans.

Effecting a corresponding increase in employee contributions was an obvious answer to these concerns, but the legislature was initially unwilling to impose such a financial hardship on public employees. When it was later determined, however, that the legislature could, through imposing some relatively insignificant new restrictions upon the operation of the pension plans, provide a permanent and very advantageous "tax shelter" benefit to public employees which would operate to more than compensate these employees for the temporary increase in employee contributions, the political decision to enact the pension contribution provisions was made. This record demonstrates that the legislature proceeded with care and creativity to enact a program of budget

designing the Act to achieve these purposes, the legislature irrationally treats differently persons who are similarly situated.

Appellants advance a number of arguments in an effort to support their contention that the Act classifies persons who are similarly situated in a manner which, when viewed in relation to the purposes of the Act, is wholly irrational. First, appellants argue that the employee contribution provision is not rationally related to its underlying purpose because the provision, which does not affect all public employee pensioners, is impermissibly underinclusive.[16] The class of public employees not affected by the employee contribution provisions of the Act is the University of Minnesota faculty, and appellants contend that there is no rational basis for this omission. There are, however, a number of considerations which support the rationality of the legislature's decision to exempt University faculty from the obligation to increase their pension contributions. University faculty have a separate pension fund and employer contributions to this fund were not affected by the Act.[17] Thus, if the purpose of the challenged provision was to maintain the actuarial integrity of the public pension

funds affected by the Act's budget cuts, it was rational to exclude the unaffected plan of the University of Minnesota faculty. Moreover, the legislature's initial failure to reduce employer contributions to the University faculty's pension plan was not irrational. In order for the legislature to have effectuated a four percent reduction of employer contributions to the University faculty's pension plan, state appropriations to the University would have had to have been "earmarked," or specifically set aside for that purpose. *See Regents of the University of Minnesota v. Lord,* 257 N.W.2d 796, 800–01 (Minn.1977). Under the Minnesota Constitution, such conditions may be an improper invasion of the management prerogatives of the Board of Regents and, in any event, the Board of Regents may decide whether or not to accept appropriations made with such conditions. *Id.,* Minn. Const. art. XIII, § 3. The independent nature of the University faculty's pension fund, and the fact that that fund was not affected by the Act's budget cuts, provide a rational basis for the omission of the University faculty from the Act's employee contribution provisions.[18]

cuts which would be least harmful to employees of state and local government.

16. Appellants also argue that the provision increasing employee contributions creates a classification distinguishing public from nonpublic employees which is not rationally related to the achievement of the purposes of that provision. This argument is without merit. The purposes of the provision which temporarily raises public employee pension contributions 2% are to maintain the actuarial soundness of those portions of the public retirement system affected by the budget cuts and to thereby, albeit indirectly, enhance the general financial posture of state government. In drafting the challenged provision, the legislature did not make a classification which distinguished public from nonpublic employees. Nonpublic employees do not contribute, and are not beneficiaries of, public retirement systems. The two purported "classes" were not similarly situated because the legislature was not in a position to raise the pension contribution rates of nonpublic employees, nor would such a provision have furthered the purposes of the Act. Put another way, the requirement that only public, and not nonpublic, employees temporarily contribute an additional 2% of salary to their pension

funds is rationally related to the legitimate state interest in preventing undue economic displacement by maintaining the actuarial integrity of the public retirement system.

17. In determining the unique status of the University faculty's pension plan, the Commission on Pensions and Retirement stated:

One plan is not established specifically by statuate and is not governed to any substantial extent by statute or special law other than the actuarial reporting required under Minnesota Statutes, Chapter 356. [*See* Minn.Stat. § 356.20, subds. 2(9), (10) (1982)] This plan is the University of Minnesota Faculty Retirement Plan. Policy determinations for this plan lies with the Board of Regents of the University of Minnesota.

Legislative Commission on Pensions and Retirement, Report to the 1979–1980 Minnesota State Legislature, at 12.

18. In addressing appellants' equal protection challenge regarding the omission of the University faculty, the dissent asserts that it is a denial of equal protection to increase any public employee's pension contributions without similarly increasing the pension contribution of

Appellants' primary argument in the equal protection context is that the increased employee pension contributions, when considered in conjunction with the purpose and effect of the related decrease in employer contributions, constitutes a discriminatory tax. In other words, appellants contend that, although the increase in employee contributions is physically paid into the pension funds, the increase of employee contributions replaces employer contributions which are withheld for general fund purposes and that this, in effect, is a payroll tax which directly benefits the state general fund. Constitutional challenges of a tax as discriminatory arise under the federal equal protection clause and the state uniformity clause.[19] The requisite initial determination in any analysis under the uniformity clause is that the challenged provision is, indeed, a tax. We conclude that the increased employee pension contribution is not a tax and we therefore reject appellants' uniformity clause challenge.

The characteristics of the increase in employee pension contributions differ significantly from those of a tax. These different characteristics include the facts that employee pension contributions are credited to the employee's individual retirement account, and that the contributions entitle the employee to receive pension benefits upon retirement. Therefore, unlike a tax, the pension contribution inures to the benefit of the employee upon his retirement, and is not collected for the benefit of the public generally. As stated by the trial court, "[i]t is definitely not the nature of a tax that it should inure to the direct financial gain of the taxpayer." These characteristics distinguish pension contributions from taxes. *See Gossman v. State Employees Retirement System,* 177 Neb. 326, 332–33, 129 N.W.2d 97, 102 (1964) (public employee pension contribution held not to be a tax because not "an exaction or tax for the purposes of carrying on the general functions of government"). The absence of a tax is dispositive of appellants' uniformity clause challenge.

### 3. DUE PROCESS ISSUES

Appellants' claim that the Act violates the substantive guarantees of due process has two components.[20] In a variation of the arguments made in the equal protection context, appellants first contend that the provisions of the Act increasing employee pension contributions are not rationally related to a legitimate governmental purpose and therefore violate both the state due process clause, Minn. Const. art. I, § 7, and

*all* other public employees. The application of such a *per se* rule is inappropriate under any standard of equal protection, but is particularly improper in the context of a review of the rational basis of a legislative act. Appellants concede that the applicable constitutional standard is the rational basis test, and this test does not remotely correspond to the dissent's blanket prohibition. Rather, under the applicable standard, the proper judicial inquiry is whether the challenged legislative classification is rationally related to a legitimate governmental interest.

Perhaps the dissent means to suggest that legislation which raises the pension contribution rates of one group of public employees without imposing a corresponding increase upon all other public employees can never be rationally related to a legitimate governmental interest. This proposition also lacks merit. It must be remembered that there are 640 different plans which provide retirement benefits to approximately 225,000 public employees in Minnesota, and that these plans "reflect a very complex picture of varying structure, legal authority, membership coverage, benefits, costs and financing." Legislative Commission on Pensions and Retirement, Report to the 1979–1980 Minnesota State Legislature, at 8. There are a number of legitimate purposes for which contribution levels to any one of the 640 plans may be changed, including the financial condition of the particular plan, the changing of that plan's benefit levels and general budget considerations. The rationality of an increase in contribution levels to participants in any one plan must be assessed on its merits by reference to the purposes for which the increase was imposed. Contrary to the position of the dissent, any such change would not necessarily be wholly unrelated to any legitimate governmental interest.

19. As previously indicated, the state uniformity clause, Minn. Const. art. X, § 1, restricts the legislature's ability to tax to the same extent as the federal equal protection clause.

20. Appellants do not contend that the challenged governmental action was the result of

the due process clause of the fourteenth amendment, U.S. Const. amend. XIV.[21] Second, appellants argue that increased employee pension contributions constitute a "taking" of property for a public use without just compensation. Constitutional prohibitions of such uncompensated expropriations exist in both the federal constitution, U.S. Const. amend V,[22] and the state constitution, Minn. Const. art. I, § 13.

The threshold determination in a due process claim is whether the interest allegedly interfered with rises to the level of a constitutionally protected "liberty" or "property" interest. Appellants present two arguments in an effort to establish a constitutionally protected property interest that has been affected by the increase in employee pension contributions.[23] First, appellants argue that they have a contractual right in employee contributions levels that has been altered by the Act. It is recognized that contractual rights are a form of property within the meaning of the due process clause. *See United States Trust Co. v. New Jersey,* 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 1516 n. 16, 52 L.Ed.2d 92 (1977). Appellants' claim to such property fails, however, because, as is treated more fully in our discussion of appellants' claim under the contract clause, we reject the theory that appellants ever had a contractual right to fixed levels of employee pension contributions.

A second theory advanced by appellants is that they have a property interest in their individual salaries which has been interfered with. Although it is clear that salary is a form of property protected by the guarantees of due process, it is unclear whether this interest has been interfered

with to an extent which requires an analysis of whether that interference meets due process standards. Appellants concede that the Act does not affect the gross salaries of public employees. Appellants maintain, however, that it is the Act's effects upon employees' net salaries which constitutes the impermissible interference. Yet, the Act's effects upon the net salaries of public employees is, in most cases, beneficial. It is true that the net salaries of affected public employees will be temporarily reduced by two percent. Countervailing this temporary decrease, however, is the long term net increase conferred by the "pick up" provision of the Act which permits an employee's total pension contribution to be treated for federal income tax purposes as an employer contribution. This "pick up" provision is permanent and will result in a substantial federal income tax savings. *See supra* note 5. In most cases, and even considering the two percent increase in employee pension contributions, the Act will operate to provide public employees more disposable income than would have been available to them if the Act had never been enacted.

Even if we assume, however, that appellants have demonstrated a property right which has been interfered with, it is clear that that interference satisfies the demands of due process. With regard to appellants' due process challenge to the rationality of the Act, our rationality analysis in the due process context is no more restrictive than that conducted in the equal protection context. *See, e.g., Guilliams v. Commissioner of Revenue,* 299 N.W.2d 138, 144 (Minn.1980). Therefore, for the reasons discussed above in our analysis of appellants' equal protection challenge, we reiter-

an unfair procedure, and this appeal therefore does not raise "procedural" due process issues.

21. We have repeatedly recognized that our state due process clause is not more restrictive than the federal due process clause. *See, e.g., Shreve v. Department of Economic Security,* 283 N.W.2d 506, 509 (Minn.1979); *Anderson v. City of St. Paul,* 226 Minn. 186, 190, 32 N.W.2d 538, 541 (1948). We will therefore apply a common standard in our discussion of the challenges brought under the separate clauses.

22. The Fifth Amendment's proscription of the uncompensated taking of private property for public uses has, of course, been applied to state action through the fourteenth amendment. *See, e.g., Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 122, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978).

23. Appellants do not allege, and the record does not show, that the increase in employee pension contributions interferes with a protected "liberty" interest.

ate our conclusion that the temporary increase is rationally related to a legitimate governmental purpose.

 With regard to appellants' "taking" claim, the constitutional prohibition against governmental expropriation of private property applies only when it is demonstrated that that property has been taken for public purposes. *See generally* L. Tribe, *American Constitutional Law,* § 9–2 (1978). Here the increased employee pension contributions were enacted for the purpose of maintaining the actuarial integrity of the public employee pension funds. This action benefits the contributors themselves, and is not a public use within the meaning of the constitutional proscription because only the contributing members can be beneficiaries of the pension plans. *See Stevens v. Board of Trustees of the Police Pension Fund of Shreveport,* 370 So.2d 528, 531 (La. 1979) (public employee's pension contribution not a public use of private funds). Accordingly, assuming the requisite interference with a property right, there has been no impermissible taking of private property for a public use.

### 4. UNFAIR LABOR PRACTICE ISSUES

 Appellants argue that employee pension contribution levels are a subject of bargaining which the legislature cannot unilaterally change without committing an unfair labor practice. Originally enacted in response to widespread dissatisfaction with the prevailing system of public employment labor relations, the Public Employment Labor Relations Act of 1971 (PELRA) provides a comprehensive structure for conflict resolution in public employment. *See generally* Note, *The Minnesota Public Employment Labor Relations Act of 1971: Another Public Employment Experiment,* 57 Minn.L. Rev. 134 (1972). Pursuant to Minn.Stat. § 179.66, subd. 2 (1982), PELRA places an obligation upon public employers to negotiate "terms and conditions of employment," which in relevant part are defined, at Minn. Stat. § 179.63, subd. 18 (1982), as: "the hours of employment, the compensation therefor including fringe benefits *except retirement contributions or benefits,* and the employer's personnel policies affecting the working conditions of the employees." (Emphasis added). Appellants' primary argument in support of their theory that the Act constitutes an unfair labor practice under PELRA is that the Act's 2% increase in employee contributions is violative of the employer's obligation to collectively bargain terms and conditions of employment. Although appellants concede that the express exclusion of "retirement contributions or benefits" in PELRA's definition of terms and conditions of employment removes the issue of employee pension contributions from the category of mandatory subjects of bargaining, they nonetheless argue that this statutory exclusion has no effect upon the status of employee contributions as a permissive subject of bargaining upon which, because contribution levels had been implicitly bargained into existing agreements,[24] the employer was obligated to negotiate.

Appellants advance two arguments in support of their contention that pension contribution levels are a permissive subject of bargaining. First, appellants rely upon a 1975 letter to that effect from an attorney general's staff attorney who was assigned to the Metropolitan Transit Commission. This letter, however, is apparently not a formal opinion of the attorney general and, in any event, is not binding upon this court.

24. Appellants' contention that employee contribution levels are implicitly fixed in existing collective bargaining agreements is based on the rationale that the terms and conditions specified in existing agreements were agreed to by negotiators in reliance upon a fixed rate of employee pension contributions. Even assuming that such "implicit bargaining" did occur, it is clear that appellants' contention is premised upon the legal conclusion that pension issues are a permissible subject of bargaining. However, we conclude that PELRA's express exclusion of pension considerations from the definition of terms and conditions of employment was established to take all pension issues completely out of the scope of permissible bargaining, and that it is consequently illegal to agree to provisions, express or implied, which purport to restrict the legislature's freedom to act with respect to such issues.

*See, e.g., Village of Blaine v. Independent School District No. 12,* 272 Minn. 343, 353, 138 N.W.2d 32, 39 (1965). Second, appellants argue that the absence of a reference to retirement contributions or benefits in the provision of PELRA which lists matters upon which the public employer is not obligated to negotiate establishes that PELRA does not prohibit negotiations on these subjects. *See* Minn.Stat. § 179.66, subd. 1 (1982). In view of the fact that the cited provision expressly provides that it contains a nonexclusive list, this argument is hardly persuasive.

A review of the legislative history of PELRA indicates that pension contribution levels were never intended to be a permissible subject of bargaining. The statutory exclusion of "retirement contributions or benefits" from the scope of bargainable "terms and conditions of employment" was added as an amendment to PELRA in 1973. Act of May 24, 1973, ch. 635, § 6, 1973 Minn.Laws 1526, 1527. The author of the amendment, Representative Donald Moe, explained the purpose of the exclusion when he offered the amendment before the House Committee on Governmental Operations: "The purpose of the amendment is to take the negotiation of pension benefits out of the bill and preserve the present situation with regard to pension benefits and that is to keep them within the realm of the legislature." Statement of Rep. Donald Moe, House Committee on Governmental Operations, March 13, 1973. Representative Moe went on to explain that the exclusion was necessary to prevent the decentralized and discordant administration of public pensions, and to maintain legislative discretion over significant matters of budgetary policy. *Id.* This legislative record reflects

a legislative intent to remove pension issues from the scope of permissible bargaining.

 Reviewing a statutory scheme of public employment relations which, in relevant part, is very similar to PELRA, the Iowa Supreme Court recently addressed this issue of the effect of a statutory exclusion of retirement issues from the scope of bargaining. In *City of Mason City v. Public Employment Relations Board,* 316 N.W.2d 851 (Iowa 1982), the Iowa court found that the legislative intent underlying the statutory exclusion was to completely remove issues regarding pensions from the scope of collective bargaining. *Id.* at 854. In so holding, the Iowa court identified three policy considerations which support the prohibition against negotiations concerning pension systems: (1) to permit employers to contain the rising cost of pension benefits; (2) to permit the legislature to participate in the making of significant government policy; and (3) to promote uniformity and to prevent the existence of disparate benefits between different funds based upon the skill and success of employees' bargaining representative. *Id.* We rely upon this reasoning and this evidence of legislative intent and hold that, pursuant to the exclusion in Minn.Stat. § 179.63, subd. 18 (1982), public pension issues are not subjects which may be collectively bargained.[25]

Pursuing a separate unfair labor practice theory, appellants argue that the Act's provision which permits employees who choose to go on unpaid leaves of absence to continue to accrue most fringe benefits is a subject of bargaining which the legislature cannot unilaterally change without committing an unfair labor practice under PELRA. The Act provides that, until June 30, 1983, state employees who choose to go on unpaid

**25.** Another argument presented by appellants in support of an unfair labor practice theory is that the Act's two percent employee contribution requirement results in a two percent decrease in the actual salary or wage of each employee which, because wages are clearly a negotiable term of employment and the Act was not negotiated, constitutes an unfair labor practice. This argument is essentially an attempt at an "end-run" around PELRA's exclu-

sion of retirement benefits from negotiable terms and conditions of employment. Because we hold that the statutory exclusion bars negotiations regarding pension contributions, we also hold that the consequences upon net salaries which result from an exercise of legislative discretion over pension contributions are permissible as a necessary incident of the scope of the statutory exclusion.

leaves of absence may continue to accrue most fringe benefits as if they had been working during their leave periods. The accrual of such benefits in these circumstances was not permitted in any existing collective bargaining agreements, so there is no question that a unilateral change in the terms of existing contracts was made. The State Budget Director testified that the purpose of the provision was to save approximately $4,500,000 to help solve the state's immediate cash flow problem and to provide a benefit to employees that would offset any short-term losses caused by the increase in employee retirement contributions. Appellants challenge this "unpaid leave" provision on the ground that it constitutes an unfair labor practice because it produces a change in the terms and conditions of employment which was not collectively bargained.

We hold that the legislature cannot commit an unfair labor practice under PELRA. Because the provision of PELRA that concerns employer unfair labor practices applies only to "public employers," Minn.Stat. § 179.68, subd. 2 (1982), and because the Legislature is not a "public employer" under PELRA, Minn.Stat. § 179.74, subd. 2 (1982), legislative acts are not covered by PELRA. Public employees' sole avenue of relief for a unilateral legislative change in the terms and conditions of employment under an existing collective bargaining agreement is to proceed under state and federal constitutional provisions. Appellants contend that the collective bargaining process will be wholly undermined if the legislature is permitted to make unilateral changes after an agreement has already been reviewed and ratified. Any unilateral legislative change would, however, still be subject to constitutional constraints. These constraints, such as the standards discussed above regarding the guarantees of equal protection and due process and the constitutional prohibition of the impairment of contracts, would appear to respond to appellants' fears by operating to invalidate legislative actions which are arbitrary or irrational, or which do not further overriding public interests.

Support for the view that legislative acts are not governed by PELRA can be found in *Minnesota Education Association v. State of Minnesota*, 282 N.W.2d 915 (Minn.1979), *appeal dismissed*, 444 U.S. 1062, 100 S.Ct. 1001, 62 L.Ed.2d 744 (1980). In that case, an arbitrator's award, rendered after an impasse in negotiations, was changed by the legislature during its ratification of the award. This unilateral change in the terms and conditions of employment was challenged, in part, on the ground that the legislature had no authority under PELRA to modify an arbitration award. In upholding the legislature's action, we reviewed the legislative history of PELRA and concluded that the legislature had reserved the "right to modify all contracts, including arbitration awards." *Id.*, 282 N.W.2d at 918. The policy reasons discussed in support of this holding are "the necessity for the representatives of the people to retain final control over appropriations and to apply uniform budgetary considerations to numerous bargaining units." *Id.* Appellants attempt to distinguish *Minnesota Education Association* by arguing that its holding applies only to the authority of the legislature to modify terms and conditions of employment in conjunction with its approval of state employee collective bargaining agreements, and that the holding cannot be extended to apply where, as in the case at bar, the legislature enacts a unilateral change after it has previously approved an agreement. Although these changed circumstances may trigger greater constitutional constraints upon the legislature's ability to act, we find that the policy considerations found controlling in the challenge to the legislature's power to act under PELRA in *Minnesota Education Association* apply with equal force to the issue of legislative authority in the present context. Accordingly, we hold that the legislative enactment of the "unpaid leave" provision does not constitute an unfair labor practice under PELRA.

Affirmed.

YETKA, Justice (dissenting).

I respectfully dissent. Because I would hold that the mandatory 2% withholding

provision is a tax that violates the state uniformity clause, Minn. Const. art. X, § 1, and an unconstitutional impairment of contract, Minn. Const. art. I, § 11, I would reverse the decision of the district court.

Nearly a year ago, in my dissent in *In re U.S. Steel Corporation v. State of Minnesota,* 324 N.W.2d 638 (1982), I wrote:

> We all must remember that our constitutions—both state and federal—were intended to protect not only one citizen from another, but also to protect all citizens from oppressive acts of the government. If the legislature can strike an illegal blow at the mighty and be permitted to get away with it, it can more easily strike again at those least able to respond. I think there is a point at which to call a halt to such activity, and this is a good opportunity.

*Id.* at 647 (Yetka, J., dissenting). Here, public employees are the victims of an illegal act of the legislature less than a year later!

I surely agree that we must give great deference to a legislative act, but the constitution was written for the courts to interpret. We must not allow the constitutional language to be an illusionary protection only.[1] To uphold the authority of the legislature to levy a tax on public employees, while excluding the general public, and unilaterally to deprive state employees of their contractual rights without sufficient justification constitute an abdication of this court's responsibility to ensure that Minnesota citizens are protected from arbitrary and discriminatory legislative action.

*Uniformity Clause*

We have previously addressed what constitutes a tax. "Taxes are pecuniary charges imposed by the legislative power to raise money for public purposes—a burden imposed to supply the very lifeblood of the state." *Great Lakes Pipe Line Co. v. Commissioner of Taxation,* 272 Minn. 403, 407, 138 N.W.2d 612, 615, *appeal dismissed,* 384 U.S. 718, 86 S.Ct. 1886, 16 L.Ed.2d 881 (1965), *quoting In re Petition of S.R.A., Inc.,* 213 Minn. 487, 488, 7 N.W.2d 484, 485 (1942). "In a general sense, [a tax is] any contribution imposed by government upon individuals, for the use and service of the state, whether under the name of toll, tribute, tallage, gabel, impost, duty, custom, excise, subsidy, aid, supply, or other name." Black's Law Dictionary 1307 (rev. 5th ed. 1979); *see also Staub v. Harris,* 626 F.2d 275, 278 (3d Cir.1980).

The 2% withholding provision is a tax. It is an enforced contribution, exacted pursuant to legislative authority, and collected from public employees to address the general budget crisis facing the state. The form of the payment is not as important as is its substance. State employees are forced to pay 2% of their gross income to the state while non-public employees are not.

The majority and the district court emphasize several characteristics of the form and nature of the contribution and conclude that it is not, in fact, a tax. They stress that each contribution is credited to an individual account, that the money is refunded if the employee leaves public service (though only prior to vesting), and that the contribution is recouped in the form of

---

1. As Justice Jackson stated in discussing the federal equal protection clause:

> I regard it as a salutary doctrine that cities, states and the Federal Government must exercise their powers so as not to discriminate between their inhabitants except upon some reasonable differentiation fairly related to the object of regulation. This equality is not merely abstract justice. The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation.

*Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 112–13, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949) (Jackson, J., concurring).

retirement benefits. These justifications are either erroneous or irrelevant. Retirement benefits were not increased. The end benefits remained the same after the contribution as they did without it. Thus, the finding of the district court that the contribution inures to the benefit of the employee is clearly erroneous.[2] While it is true that a favorable IRS ruling allowing an employee to deduct the state tax from the gross income is beneficial, some funds already had such a privilege prior to the passage of the new tax.

Further, the claim that the contribution is necessary to ensure the integrity of the pension fund and, therefore, of direct benefit to the employees is not persuasive. There is no evidence in the record that, prior to the contribution, the fund was in a less-than-adequate financial position. The district court, in its findings of facts, found that the fund was in a "reasonably good financial condition." The Legislative Commission on Pensions and Retirement,[3] in its report to the 1979–1980 Minnesota State Legislature, came to the same conclusion. To the extent that the fund is compromised, it is the result of the companion decrease in the state's contributions to the fund. The legislature enacted both provisions in the same bill to combat the same problem—the state's budget crisis. One cannot be reviewed without consideration of the other.

In light of our obligation to review statutes as a whole and to pierce form to evaluate the substance of legislation, I can only conclude that state employees received no greater benefit than did the public at large from the pension fund contributions. If *all* taxpayers were required to contribute an extra 2% of their income to the state coffers, no one would dispute that the contribution would constitute a tax. If a bird looks like a duck, quacks like a duck, and walks like a duck, it is most likely a duck. Likewise, if an act looks like a tax, raises revenue like a tax, and is mandatory like a tax, it is a tax.

The great majority of our citizens pay into the federal social security fund. Congress has mandated coverage for most workers. The payments are made to the federal government in the form of payroll deductions. Historically, these deductions have been referred to as "payroll taxes." One need only pick up recent newspaper and magazine articles addressing recent amendments to that act and read the pros and cons of increasing the *taxes* to make the system solvent to conclude that the contributions are indeed taxes. Those taxes are dedicated for the specific purposes set forth in the Social Security Act. Minnesota has road user, motor vehicle, and gasoline taxes. These funds are also dedicated for specific state highway funding purposes, but are they any less a tax? To ask the question, it seems to me, is to answer it. Of course they are taxes and so is the levy the

---

2. The majority cites *Gossman v. State Employees Retirement System,* 177 Neb. 326, 129 N.W.2d 97 (1964), for the proposition that pension contributions are distinguishable from taxes. In *Gossman,* the Nebraska Supreme Court considered the constitutionality of a state employee retirement system at the time of its creation. The court held that a 1 percent contribution by current employees to fund a prior service benefit fund was not a tax. The court, however, focused on the fact that the contribution was a voluntary one, arising from the acceptance of employment. Further, the contribution was for the purpose of providing benefits under the pension plan and was "not an exaction or tax *for the purposes of carrying on the general functions of government." Id.* at 332, 129 N.W.2d at 102 (emphasis added).

In the instant case, the contribution did not result in the creation or maintenance of any retirement benefits. It was intended to replace funds no longer contributed by the state, such funds being diverted to the state's general fund for the purpose of alleviating the general budget deficit.

3. The Legislative Commission on Pensions and Retirement was originally established as an interim commission by the 1955 Legislature. Its purpose was to study public retirement problems in light of changes made by the 1955 Legislature. The commission was maintained as an interim commission by each successive legislature, with the exception of the 1961 session, until 1967. The 1967 Legislature established the current permanent commission, which has issued reports to each legislature up to the present.

legislature has made on state employees in the act before us.

Concluding that the contribution constitutes a tax, I now subject the provisions to the standards of judging constitutionality in light of the state uniformity clause. In interpreting our state uniformity clause, we are not bound by federal court interpretation of the federal equal protection clause. Because I conclude that the statute fails to pass constitutional muster under the independent state basis mandated by our state uniformity clause, I do not address whether it would pass the "rational basis" test under the federal equal protection clause.

The first step in analyzing any statute under the uniformity clause "rational basis" standard is identifying the purpose the statute was intended to fulfill. Here we have both the expressed purpose to solve the state's budget crisis, contained in the statute itself, and a purpose argued by the state's attorneys that the 2% contribution is necessary to ensure the integrity of the pension fund because of the 4% cut in employer contribution.

No single approach has been followed by courts in identifying the appropriate purpose to apply in constitutional analysis. See Leedes, *The Rationality Requirement of the Equal Protection Clause,* 42 Ohio St.L.J. 639, 642–47 (1981). The United States Supreme Court has taken several different approaches, including hypothesizing any potential purpose, whether or not expressed by the legislature or the state's advocates, see *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980), and requiring that a deliberate choice of purpose be expressly stated in the legislation itself or actually discernible from legislative history, see *Schweiker v. Wilson,* 450 U.S. 221, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981). Between these two extremes is an approach that looks for something less than express statements, but falls short of out-and-out speculation. In the instant case, we have two conflicting purposes—an express purpose stated in the legislation itself and one advocated by the state's attorneys.

I cannot accept the integrity of the fund as the proper purpose for analysis under the state uniformity clause. The entire statute must be examined, not any one provision in isolation. The legislature cannot create a purpose by one portion of the statute and then use the need created thereby to justify another portion, at least when the secondary portion impinges on the constitutional rights of state citizens.

The applicable purpose is the one expressly stated in the legislation, that is, the need to balance the state budget as opposed to the "need" to shore up the pension fund. The preamble to the act clearly states the purpose of the legislation. The fact that the legislature was in special session, called for the specific purpose of addressing the budget deficit, reinforces a narrow interpretation of the purpose for constitutional analysis. Finally, to adopt any other purpose would be to elevate form over substance and ignore the actual effect of the legislation.

The majority, in effect, consolidates multiple purposes. It does so in two ways. First, it says that the adverse impact on the pension fund caused by the deprivation of employers' contributions will affect the state's credit rating which will, in turn, exacerbate the state's fiscal crisis by affecting the state's ability to borrow. Second, the majority argues that the reduction in employer contributions threatened the soundness of the fund, thereby requiring that the legislature act to protect the fund.

Neither argument is sufficient. Although no one can deny the importance to the state of a good credit rating, the 6-month decrease in employer contributions is merely one of the numerous factors threatening the rating and the equally numerous measures being pursued to protect it. The majority's argument is simply too attenuated to bring the increase in employee contributions within the ambit of the legislative purpose outlined in the bill's preamble.

The second argument is superficially more persuasive, but also fails to withstand scrutiny. To begin with, there is something facile and dangerous in saying that creating

a problem gives one carte blanche in resolving it, particularly where there is insufficient proof that the problem exists in the first place. True, there is evidence that the decrease in employers' contributions may somewhat postpone full funding of the pension system. There is also evidence, however, that full funding is not, under any circumstances, envisioned during this century. When the state's pension system was reformed in 1957, Act of April 29, 1957, ch. 935, 1957 Minn.Laws 1472, the target date for full funding was 1997. This date was pushed back to 2009 by the 1979 Legislature, Act of May 24, 1979, ch. 184, § 1, 1979 Minn.Laws 283, 285 (codified at Minn.Stat. § 356.215, subd. 4 (1982), and a procedure was adopted for revising the target date in light of changed circumstances in the future, see Legislative Commission on Pensions and Retirement, Report to the 1979–1980 Minnesota State Legislature at 6 (1979–1980). Nowhere are there signs of an imminent collapse of the system.

The majority repeatedly refers to the magnitude of the state's economic crisis and the need for swift solutions. This may explain the legislature's actions; it does not remove the taint of unconstitutionality. The constitutional entitlement to uniform treatment cannot be subverted in pursuit of credit ratings and quick fixes. Here, the money that is levied by the state can be traced directly to the general revenue fund. The statute states clearly that, in some pension plans, the state is withholding its contributions while, in others, the proceeds of the additional employee levies are to be paid directly to that fund.[4] State employees are thus contributing millions to the state revenue fund to help balance the budget.

It has been argued that, since the legislature has the power to decrease employer contributions currently, it also has the power to raise employee contributions at sometime in the future to maintain the financial integrity of the pension funds. Taking both steps in the same act must, therefore, be permissible. This argument fails for two reasons. First, it is far from clear that the legislature may unilaterally decrease employer contributions. The contract clause discussion that follows in this dissent indicates that such an act would violate the state constitutional provision proscribing impairment of contract.

Second, even assuming that a decrease in employer contributions would not violate the contract clause, a subsequent increase in employee contributions would still run afoul of the uniformity clause. A delay in imposing a tax on public employees does not render the levy any less a tax. If the classification fails to address the purpose of the legislation, it fails constitutional muster whether enacted today or 2 years from now. The applicable purpose remains the curing of the state's financial crisis. Funds previously incorporated into the general revenue fund through the decrease in employer contributions are merely replaced by subsequent employee contributions. The substance remains the same, though the form is manipulated to avoid constitutional barriers.

Any law passed by the legislature that imposes a tax on citizens of this state must pass the two-step uniformity clause test of a legitimate purpose and a classification rationally related to that purpose. Here, the test is not met because the classification consisting of state employees does not rationally relate to the purpose of curing the state's financial crisis.

---

4. Moreover, the distinction between not putting money into the pension plan and taking money out is an elevation of form above substance. Both are deprivations of contributions to the fund. An analogy can be drawn to the concept of tax expenditures. It has been clear for some time that, despite superficial differences, direct government subsidies and tax preferences (deductions and credits) are substantively the same. Not taking money from taxpayers is the functional equivalent of giving money to taxpayers. The former is an indirect tax "expenditure" while the latter is merely a more direct expenditure. See Surrey, Tax Incentives as a Device for Implementing Government Policy: A Comparison with Direct Government Expenditures, 83 Harv.L.Rev. 705 (1970). Here, we are faced with the converse situation-not giving money to employee pension plans is functionally equivalent to taking money from the plans.

The state admitted at oral argument that if the legislature had attempted to solve the entire $312 million shortfall by the levying of an increase in employee contributions to pension plans, it perhaps would have been illegal. If that is so, how can the $63 million be any less illegal? · On what theory would the larger levy be illegal and the smaller not? [5]

To me, nothing can be clearer than that the levy is a tax, a tax devoted to the general welfare of the entire citizenry of the State of Minnesota. If we uphold this scheme, what is to prevent the legislature from levying a special tax on steel workers only to help alleviate certain economic conditions on Minnesota's Iron Range, on farm families to alleviate problems on the farms, or on other industrywide workers to help or maintain industries in the State of Minnesota? I can see no distinction.

I conclude that the act violates the state uniformity clause and the district court must be reversed.

## Contract Clause

I would also hold that contract rights existed between the state and its employees and therefore disagree with the majority's finding that no contract, express or implied, governed the levels of employee contributions. Since the 1950's, the legislature has made it clear by a series of actions that it intended to guarantee that public pension funds would be actuarily sound and able to pay certain benefits. When it found those funds not sound, it increased contributions not only on the part of the employees, but the employers as well.[6] As a matter of fact, from 1959 until 1973, it imposed a special 2½ percent levy on local political subdivisions, in addition to the normal employer-employee contributions, until pre-existing fund deficits were eliminated. *See* Act of May 24, 1973, ch. 753, § 85, 1973 Minn.Laws 2266, 2308, *repealing* Minn.Stat. § 353.27, subd. 5 (1971).[7] Increases in contributions since the 1950's have been, in every instance, accompanied by increases in

**5.** Subsequent to the instant action, the 1983 Legislature amended the contribution provisions by requiring reimbursement to state employees of half the increased contributions, payable with interest at the time of the first annuity payment or upon withdrawal. *See* Act of June 8, 1983, ch. 301, §§ 225–26, 1983 Minn. Laws 1706, 1855–56. The new provisions are applicable from January 1, 1983, to June 30, 1985, and affect employees retiring during this period and participants whose contributions were increased by the legislation challenged here. While this recent enactment does lessen the impact of the original contribution provisions, it does not cure the taint of unconstitutionality.

**6.** Since the current scheme of the state's pension system was established in 1957, employer contributions have matched employee contributions. In the 1957 legislation, employee contributions were set at 6 percent. Employer contributions were gradually raised over a 2-year period until they too reached 6 percent. Act of April 29, 1957, ch. 935, § 7, 1957 Minn.Laws 1472, 1475. In 1973, when employee contributions were again increased and basic and coordinated plans were differentiated, the statute was amended to provide that employer contributions would be equal to those of employees. Act of May 24, 1973, ch. 753, § 28, 1973 Minn. Laws 2266, 2279. The express policy of the new pension system was to guarantee the financial integrity of the various pension funds

by matching current employer contributions to employee contributions and by providing for adequate future financing. Legislative Committee on Retirement and Pensions, Report to the 1979–1980 Minnesota State Legislature, at 26–27 (1979–1980).

The exceptions to the policy of lock-step contribution increases noted in the majority opinion are not significant. The 1974 amendments to the Teachers Retirement Association levels of contributions consisted of a temporary ½ percent difference enacted along with significant alterations to the operation of the fund itself. The contribution levels for correctional employee members of the state retirement system merely reflect the unique status of these employees pursuant to Minn.Stat. § 352.90 (1982), which provides special retirement benefits due to the potential for early retirement caused by the nature of the employment.

**7.** The repealed section, originally enacted by the 1957 Legislature, provided:
 An additional contribution shall be made to the fund based on two and one-half percent of the salary of each member not to exceed $4,800 in any calendar year for the purpose of amortizing the deficit in the fund. This contribution shall be made from funds available to the employing subdivision in the manner provided in section 353.28. This subdivision takes effect July 1, 1959.

Minn.Stat. § 353.27, subd. 5 (1957).

benefits.[8] It is beyond belief that, in 1983, we could find there is no guarantee that the state will continue to match the employee contribution in at least the amounts heretofore made in the past.

For the same reasons, I take strong exception to the majority opinion finding no intent to promise specific levels of state contributions or pensions. For, as we held in *Sylvestre v. State,* 298 Minn. 142, 214 N.W.2d 658 (1973), insofar as it affected the judiciary, a sound pension system is one of the few inducements for public employment. *Id.* at 149, 214 N.W.2d at 663. It is similar to a deferred compensation plan where the state offers a pension in addition to the regular salary if a public employee works for a specified period of years. For the most part, state employees are paid far less than either their federal counterparts or those in private employment for similar work. There will be a shock wave felt throughout the state if public employees are now told, in effect, that never mind what your salary was or what your pension estimates were at the time you came to work 10 years ago, these can be changed anytime.[9] Such a holding simply does not square with today's reality nor is such a

holding even consistent, in my opinion, with our recent decision in *Christensen v. Minneapolis Municipal Employees Retirement Board,* 331 N.W.2d 740 (Minn.1983).[10]

The legislature considered also a 2% across-the-board decrease in salaries, we are told. Undoubtedly, there was fear that if that course of action were taken, it would be violative of the impairment of contract clauses of the state and federal constitutions because the state had entered into a collective bargaining agreement and the legislature had ratified a contract with state employees that prohibited a cut for the period of that contract. A fiscal crisis that fails to justify a direct impairment of contract, however, cannot then be held to justify the same impairment, though accomplished in a circuitous manner.

The state emphasizes horror stories of possible layoffs in the tens of thousands in an apparent attempt to show that, even if the statute impaired contract rights, such an impairment was justified by the seriousness of the state's fiscal crisis. The state's scenario, however, envisions solving the entire $312 million shortage through layoffs and does not limit itself to the $63 million initially taxed to state employees. The con-

**8.** The 1979 amendments to the Teachers Retirement Association pension plan, Act of May 31, 1979, ch. 293, § 10, 1979 Minn.Laws 641, 648–49, noted as an exception to this overriding policy in the majority opinion, did contain an $11,600,000 appropriation to fund post-retirement adjustments, *id.,* and increased both employer and employee contributions by an identical ½ percent, *see* Legislative Committee on Retirement and Pensions, Report to the 1979–(1980) Minnesota State Legislature, at 6 (1979–1980).

**9.** The majority correctly points out that the University of Minnesota faculty and other state employees were left out of the 2% levy. It attempts to justify the omission by inherent powers given the University Board of Regents. I cannot follow that logic. Whether one works for the State of Minnesota or one of its political subdivisions, if one employee must pay the 2% contribution, all should pay, or in my opinion, there is a denial of equal protection under both federal and state constitutions. Because the autonomy of the Board of Regents is created by state constitutional provisions, and analysis of these provisions here would involve us in addi-

tional constitutional analysis, I do not reach this issue here. The tax and contract analyses are dispositive of this appeal and further discussion of this issue is unnecessary.

**10.** In *Christensen,* this court recognized a cause of action grounded in promissory estoppel to challenge deprivation of pension benefits and other changes in pension terms and conditions. The majority opinion rejects this claim here and endorses the district court's finding that, due to numerous modifications of contributions and appropriations in the past, any employee expectation in fixed contribution rates is unreasonable. This logic ignores the fact that the clear pattern of the modifications made by the legislature is one of increasing benefits and matching employer contributions. The modification in dispute in the instant case is drastically different in that employee contributions were raised and employer contributions lowered. There may be no reasonable expectation in fixed rates. There may be, however, a reasonable expectation in matching contributions and continued maintenance of benefits as well as salary.

sequences of solving only $63 million of the shortage through layoffs are obviously far less serious and do not justify the state's impairment of its employees' contract rights. Further, the legislature did not sufficiently consider other fiscal relief measures before it resorted to the expedient of tampering with the pension fund. There is no indication that the sought-after $63.5 million was obtainable nowhere else than from public employees' pockets.

Perhaps there is some validity to the argument that the legislature felt state employees ought to share in the cost of the solutions to the state's financial crisis. In my opinion, however, the legislature has passed far over the line on what is permissible and what is not in enacting this statute. Other jurisdictions have held that increases in public employee pension contributions without counterbalancing increased benefit to the employee constitute impairments of contract rights. *Allen v. City of Long Beach,* 45 Cal.2d 128, 287 P.2d 765 (1955); *Marvel v. Dannemann,* 490 F.Supp. 170 (D.Del.1980); *Singer v. City of Topeka,* 227 Kan. 356, 607 P.2d 467 (1980); *Opinion of the Justices,* 364 Mass. 847, 303 N.E.2d 320 (1973). California recently held that a decrease in employer contributions to a public pension reserve fund was an unconstitutional impairment of contract. *Valdes v. Cory,* 139 Cal.App.3d 773, 189 Cal.Rptr. 212 (1983).

I conclude that the doctrine of promissory estoppel creates actionable contract rights in public employees as to the state pension fund. By decreasing employer contributions and increasing employee contributions, the legislature has substantially impaired its contract with state employees, an impairment not justified by the extent of the financial crisis the legislature acted to cure.

Under the circumstances of this case, I must conclude that the legislature has failed to act in a constitutional manner. Thus, I must dissent from the majority opinion. To do otherwise appears to me to be nothing less than abolishing the historical protection afforded by our constitutions and to say, in effect, taxpayers beware be-

cause there is no longer a limit on legislative authority to classify and to tax or to rewrite state contracts at will. In this case, state employees are the victims; tomorrow, anyone else could be.

SCOTT, Justice (dissenting).

I join in the dissent of Justice YETKA.

WAHL, Justice (dissenting).

I join the dissent of Justice YETKA.

KELLEY, Justice (dissenting).

I respectfully dissent. I concur with the majority that appellants have failed to establish an express or implied contract. The three-judge panel made findings that the state made no promises regarding guaranteed levels of employee contributions to the pension funds and that appellants have failed to establish that they reasonably and detrimentally relied upon any express or implied promises made by the state. While perhaps different findings could have been made, as Justice Yetka points out in his dissent, I conclude the panel's findings on the contract issues were not clearly erroneous. I further concur that the enactment of the "Act" by the legislature was not an unfair labor practice under PELRA.

However, because I cannot escape the conclusion that the mandatory 2% withholding provision is a tax, and, as such, that it violates the state uniformity clause, Minn. Const. art. X, § 1, I join the dissent of Justice Yetka and would reverse on that ground only.